600 December 26, 2014 No. 74

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

CELSO AVILA-NAVA,
*Respondent on Review.*

(CC C092845CR; CA A146527; SC S061802)

En Banc

On review from the Court of Appeals*

Argued and submitted September 15, 2014.

Peenesh Shah, Assistant Attorney General, Department of Justice, Salem, argued the case and filed the brief for the petitioner on review. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Jed Peterson, O'Connor Weber, LLP, Portland, argued the case and filed the brief for the petitioner on review.

BREWER, J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Kistler, J., filed an opinion concurring in part and concurring in the judgment, in which Linder, J., joined.

_____
   * Appeal from Washington County Circuit Court, Rick Knapp, Judge. 257 Or App 364, 306 P3d 752 (2013).

**BREWER, J.**

Under Article I, section 12, of the Oregon Constitution, police must cease custodial interrogation when a criminal suspect unequivocally invokes his or her right against self-incrimination. *State v. McAnulty*, 356 Or 432, 455, __ P3d __ (2014); *State v. Davis*, 350 Or 440, 459, 256 P3d 1075 (2011). This case raises the broader question of what standard applies to determine whether an unequivocal invocation of the right against self-incrimination was made and the particular question of whether, in the context in which they were communicated, defendant's words, "I won't answer any questions," constituted an unequivocal invocation of that right. The trial court found, in light of contextual indicia on which it relied, that defendant's words did not amount to an unequivocal invocation and denied his motion to suppress. The Court of Appeals reversed that ruling and remanded to the trial court. *State v. Avila-Nava*, 257 Or App 364, 306 P3d 752 (2013). Having allowed review, we affirm the Court of Appeals decision and remand this case to the trial court for further proceedings.

## FACTS AND PROCEDURAL HISTORY

The pertinent facts are undisputed. Hillsboro police officers, who were investigating a robbery for which defendant was a wanted suspect, stopped a vehicle that defendant was driving. Defendant was arrested, handcuffed, and taken into police custody. At the scene of arrest, an officer read the *Miranda* warnings to him from a prepared card that had the warnings, in Spanish, printed on it.[1] The officer read the warnings in Spanish because defendant had indicated that he did not speak English. After the officer read the warnings, defendant stated that he understood his rights. Officers then transported defendant to the Hillsboro Police Department.

---

[1] In *Miranda v. Arizona*, 384 US 436, 444, 86 S Ct 1602, 16 L Ed 2d 694 (1966), the Supreme Court held that the Fifth Amendment to the United States Constitution requires particular warnings be given when "a person has been taken into custody or otherwise deprived of his freedom in any significant way." Those warnings are that a person "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." *Id.* at 444.

At the police station, Detectives Ganete and Hahn interviewed defendant. Ganete spoke Spanish throughout his interaction with defendant. Ganete testified that he had no trouble understanding defendant and that defendant did not appear to have difficulty understanding his questions. Ganete testified that he read the *Miranda* warnings to defendant, from a prepared card that stated (translated from Spanish):

> "It is my [duty] to inform you before you make a declaration that you have the right to remain silent.
>
> "Anything you say may be used against you in a court of law or a judicial tribunal.
>
> "You have the right to speak to an attorney and to be [sic][2] present during the interrogation.
>
> "If you do not have the funds to contract an attorney, the court will assign one to you without cost."

Ganete then asked defendant whether he understood those rights. Defendant replied: "I have a question. Do I have to answer your questions?" Ganete responded that defendant "did not have to answer any questions or talk to me if he chose to." Defendant then asked Ganete "why did mister call the police?" In response, Ganete told defendant that "we needed to get past first his understanding of the *Miranda* warning before we can actually begin to speak with each other." Ganete then stated that defendant had to decide whether to talk to him or not, and Ganete read the *Miranda* warning card again. Ganete "took each right line by line and asked if [defendant] understood each right, and he understood the rights with the exception of *** where he questioned anything you say may be used against you in a court of law." After Ganete read that warning, defendant said "I don't understand what this means." Ganete asked "what is it you don't understand," and defendant replied, "anything I say can be used against me." Ganete said, "that's correct. Anything you say can be used against you." At that point, defendant stated: "I won't answer any questions."

---

[2] As noted above, the right to counsel includes the right to have an attorney present during police interrogation. Defendant does not assert that any ambiguity or error in Ganete's recital of that right is pertinent here.

Ganete then asked if defendant meant that he did not want to talk to Ganete and that he wanted him to leave. Defendant responded, "No, I can't talk to you if I don't understand what this right means because you're telling me I have the right to remain silent. I don't understand what this right means." At that point, Ganete again read the warning that "anything you say may be used against you." As he was doing so, defendant interrupted him and said, "pardon. I'm not trying to be disrespectful. How can I say this?" Defendant paused before saying, "[a]nything I say can be used against me. It's like I'm lying?" Ganete characterized that question as "more like [defendant] was doubtful of understanding what it meant and interpreting it as 'well, it's like I'm lying then.'" Ganete proceeded to reiterate the warnings, because "we were kind of hung up in this—on this right *** because we were at this point where we weren't making any progress of understanding; so I thought that, 'Okay. We'll come back to that right afterwards and see if he would understand then.'"

After repeating the *Miranda* warnings, Ganete asked defendant if he understood them, with the exception of the warning that anything that he said could be used against him. Defendant replied: "That's exactly what I don't understand." Ganete

> "then asked [defendant] if—how many—how many years of schooling did he have, and he mentioned he had up to sixth grade. I asked if he knew how to read Spanish, and he said, 'yes, a little bit.' And then I suggested, I says, 'If I show you the *Miranda* rights card, are you able to read and understand?' And he said, 'yes, I can.'"

Ganete then gave the *Miranda* card to defendant, who read the warnings out loud. After defendant finished reading the card, Ganete said:

> "'It's my duty to inform you before you make a declaration,' you have the right to remain silent.' [Defendant] pauses and asks us a question, 'You can—you can just ask me questions then?', and I replied, 'If I tell—if you tell me that you wish to remain silent, I can't question you." [Defendant] then said, 'Now, I understand'.

"I then explained to [defendant] we needed to establish if he wants to speak with me or not, which is a lot different than if he agrees to speak with me.

"However, during my questioning, he may choose to answer or not answer specific questions, and that was fine with me.

"Finally, I asked [defendant] 'Do you understand your rights?' And he said 'Yes,' and then I asked, 'Do you understand the *Miranda* warning card you read?' He, [defendant] said, 'Yes,' and I asked 'Do you want to speak with me freely?' [Defendant] said, 'Yes.'"

Before Ganete concluded his testimony, the trial court engaged him in the following colloquy:

"[The Court]:  I'm a little confused. He said at one point that I won't answer any questions, and then it seems pretty unequivocal. Why did you continue?

"[Ganete]:  Because I asked at one point 'are you saying you don't want to talk to me at all? You just want me to go away?' And his expression was, 'no I can't talk to you if I don't understand what this right means because you're telling me I have the right to remain silent. I don't understand what this means.'

"So, your honor, I guess to clarify this, I—my understanding is that he wasn't understanding that right, and I made every effort to explain to him what that meant and this was our going back and forth until he finally said, 'Oh, I see what you're telling me. Okay. Under that condition, then I want to talk to you. I understand what that right means.'

"[The Court]:  So when he said to you, 'I won't answer any questions,' that was phrased to you as a not a statement of—did you receive that as a statement where he was unequivocally exercising his rights not to talk to you, or was that a question he was pondering to you?

"[Ganete]:  I interpreted it as a question that he was pondering to me from lack of understanding. I didn't accept that as unequivocally, he's saying, 'I don't want to talk to you.'"

Defendant's counsel argued at the suppression hearing that, when defendant said "I won't answer any

questions," Ganete was required to terminate the interrogation, because those words have the same effect as "I choose to remain silent" and "I won't talk to you." The prosecutor responded that defendant had not unequivocally invoked his right against self-incrimination and that Ganete's continued questioning was meant to ensure that defendant understood his rights. Because defendant indicated that he understood those rights before he made incriminating statements, the prosecutor reasoned, defendant had validly waived his right against self-incrimination.

The trial court denied defendant's motion to suppress. The court explained:

"[T]he court's responsibility is to look at the totality of the facts surrounding the *Miranda* issue, and when you first—so there was this discussion that was going on between Officer Ganete and the defendant, and they started getting hung up on this one right that anything you say can be used against you in a court and wasn't sure what that was all about. And then the defendant says, 'I won't answer any questions,' and, you know, when you first hear that, you think that it's a unequivocal exercise of his *Miranda* rights, and it should be shut down at that point.

"But Officer Ganete took great effort to try to explain to the court that it—it wasn't that he was exercising his rights. He wasn't saying 'I won't answer any questions.' It was that he didn't know if he wasn't supposed to answer any questions or not, and so there's this—he was—it was apparent that the defendant was confused about what his rights were, and that's later cleared up before defendant says, 'Okay. Now I understand.'

"And so I at first thought it was actually an unequivocal exercise of his *Miranda* rights, but it was clear that that was—is not the case even though he did say, 'I won't answer any questions.' But it was posed more of a—as a quandary. The defendant didn't quite understand what was going on at the time.

"I'm supposed to look at the totality of the facts to try and understand this to make sure that the statements were voluntary, first of all, and it's real clear that there were no threats. There wasn't any coercion. There were no promises, no trickery, no fraud, no intoxication. He was

confused initially, which is the biggest hurdle that they have—that the police have at the time to allow the statements for him to be voluntary. He's got to understand these obviously at least the *Miranda* rights and so forth, but they seem to be—they work through it, and the officer spent a lot of time with the defendant making sure he understood his *Miranda* rights. I don't believe under the totality of the facts that I heard that he was trying to manipulate the defendant in the situation.

"So then the next question is—so I do think the statements that he made subsequently were voluntary. I haven't heard the statements, but I'm assuming that they will be. The question is then did the defendant waive his *Miranda* rights or was this comment, 'won't answer any questions,' an unequivocal exercise of his *Miranda* rights, and that's where I say I think the—in the totality of the facts that it's not unequivocal exercise of rights. He's trying to understand what his rights are, and that's what we want the police to do when someone's not quite understanding it to explain it in detail so that they—so when it's all over with, and the person understands his rights, he can then say, 'No, I don't want to talk to you. I won't answer any questions. Or yeah, I'll talk to you.' And, apparently, after he understood his rights, he did decide to talk to the police.

"So from the totality of the circumstances, I do find that he voluntarily and knowingly waived his *Miranda* rights. It's a bit different than we typically see, but obviously, there was a Spanish speaking issue here that they had to work through in terms of the *Miranda* rights. And obviously, the *Miranda* rights aren't really clearly interpreted from English into Spanish anyway, and so you can see where there's a process that has to take place where these rights are explained in detail to someone who doesn't speak English to be able to make sure that they clearly understand, and I do think he clearly understood what his *Miranda* rights were. So I will allow the statements to come in."

Defendant testified at trial, and the state impeached him by pointing to inconsistencies between his trial testimony and his statements during interrogation. As the case was tried, an assessment of defendant's credibility was essential to the jury's consideration of the charges against him. The jury convicted defendant, and this appeal followed.

ANALYSIS

Article I, section 12, of the Oregon Constitution provides that "[n]o person shall be *** compelled in any criminal prosecution to testify against himself." To protect a person's right against compelled self-incrimination under that provision, this court has held that, before questioning, the police must give *Miranda* warnings to a person who is in "full custody" or in circumstances that "create a setting which judges would and officers should recognize to be 'compelling.'" *State v. Jarnagin*, 351 Or 703, 713, 277 P3d 535 (2012); *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990). When an officer fails to give the requisite warnings, a court must suppress not only the statements that a suspect makes in direct response to unwarned questioning but also evidence that derives from or is a product of that constitutional violation. *State v. Vondehn*, 348 Or 462, 476, 236 P3d 691 (2010).

In *Vondehn*, this court examined the basis for the requirement that police inform people in custody of their right against self-incrimination under Article I, section 12. The court explained that,

"[b]ecause a custodial interrogation is inherently compelling, and to ensure the validity of a waiver of the right against self-incrimination, Article I, section 12, requires that the police inform a person subjected to custodial interrogation that he or she has a right to remain silent and to consult with counsel and that any statements that the person makes may be used against the person in a criminal prosecution. Article I, section 12, requires those *Miranda* warnings to ensure that a person's waiver is knowing as well as voluntary. If the police conduct a custodial interrogation without first obtaining a knowing and voluntary waiver of the suspect's rights, then they violate the suspect's Article I, section 12, rights."

348 Or at 474; *see also* *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006) ("To protect a person's right against compelled self-incrimination under [Article I, section 12], this court has held that, before questioning, police must give *Miranda* warnings to a person who is in 'full custody' or in circumstances that 'create a setting which judges would and officers should recognize to be 'compelling'").

As noted, under Article I, section 12, police must cease interrogation when a person in police custody unequivocally invokes the right against self-incrimination. *McAnulty*, 356 Or at 455. The reason for that requirement is that,"[w]hen the police honor [a defendant's rights under Article I, section 12], if [the] defendant chooses to assert them, the coercive atmosphere of police interrogation is to some degree dispelled." *State v. Sparklin*, 296 Or 85, 89, 672 P2d 1182 (1983). When the defendant makes an ambiguous or equivocal invocation of rights under Article I, section 12, however, the police are required to ask follow-up questions to clarify what the person meant before proceeding with interrogation. *State v. Charboneau*, 323 Or 38, 54, 913 P2d 308 (1996).[3] In determining whether the defendant unequivocally invoked his or her rights, "interpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous." *Connecticut v. Barrett*, 479 US 523, 529, 107 S Ct 828, 93 L Ed 2d 920 (1987); *accord State v. Kell*, 303 Or 89, 99, 734 P2d 334 (1987).[4]

What transpired during a custodial interrogation, including what a defendant said or did not say, is a question of fact. We are bound by the trial court's findings of fact if they are supported by evidence in the record, although "we assess anew whether th[ose] facts suffice to meet constitutional standards." *State v. James*, 339 Or 476, 481, 123 P3d 251 (2005). That is, whether a defendant's statements amounted to an unequivocal invocation of the right against self-incrimination, an equivocal invocation, or no invocation at all, is a question of law. *State v. Terry*, 333 Or 163, 172, 37 P3d 157 (2001), *cert den*, 536 US 910 (2002).

As the trial court in this case acknowledged, defendant's statement, "I won't answer any questions" appeared on its face to be an unequivocal assertion of his right against

---

[3] Unlike Article I, section 12, the Fifth Amendment does not obligate officers to ask clarifying questions regarding a suspect's intent in making an equivocal invocation. *Davis v. United States*, 512 US 452, 461, 114 S Ct 2350, 129 L Ed 2d 362 (1994).

[4] When a person unequivocally invokes her right against self-incrimination, police may reinitiate contact after a reasonable time, provide new *Miranda* warnings, and obtain a valid waiver. *McAnulty*, 356 Or at 458.

self-incrimination. The question is whether the trial court nevertheless properly determined that the statement was equivocal. Because it is central to our analysis, we first consider an issue that this court previously has not directly addressed under Article I, section 12, namely, whether in determining if a suspect in police custody has unequivocally invoked his or her right against self-incrimination, a court can consider a suspect's post-request responses to further police questions.

This court must independently analyze the meaning, scope, and requirements of Article I, section 12, just like any other provision of the Oregon Constitution. *See*, *e.g.*, *State v. Caraher*, 293 Or 741, 748, 653 P2d 942 (1982) (stating principle). When construing a provision of the original Oregon Constitution (and Article I, section 12, is such a provision), we examine the text in its context, the historical circumstances of the adoption of the provision, and the case law that has construed it. *Priest v. Pearce*, 314 Or 411, 415–16, 840 P2d 65 (1992). Insofar as the issue at hand is concerned, the text in context and historical circumstances of the adoption of Article I, section 12, do not assist our analysis. However, our previous decisions construing Article I, section 12, do provide some guidance.

In *State v. Smith*, 310 Or 1, 791 P2d 836 (1990), the defendant argued that he had invoked his rights against self-incrimination under Article I, section 12, and under the Fifth Amendment, when, during a police interview, he said, "I have nothing to say" in response to a detective's hypothetical description of how he might have killed his wife. Based on the context in which the remark was made, the trial court concluded that the defendant had not invoked his right against self-incrimination, but, instead, merely had exercised his right to answer some questions and not to answer others. *See Kell*, 303 Or at 99 ("Defendant was entitled to pick and choose what he wished to talk about."). This court agreed with the trial court's conclusion, because it found "'nothing which suggests that detectives persisted in repeated efforts to wear down [the defendant's] resistance and make him change his mind.'" *Smith*, 310 Or at 10 (quoting *State v. Foster*, 288 Or 649, 656, 607 P2d 173

(1980)).[5] In so concluding, the court analyzed the defendant's words in the context in which they were uttered, including the preceding circumstances.

Later, in *Charboneau*, a case involving the asserted invocation of the right to counsel under Article I, section 12,[6] the defendant sought to exclude inculpatory statements that he made after he asked, "Will I have an opportunity to call an attorney tonight?" 323 Or at 52. This court concluded that any request for counsel was equivocal:

> "*In the totality of the circumstances*, defendant's question simply does not constitute, as a matter of law, an unequivocal request for a lawyer. For example: (1) Defendant did not say that he wished to speak with a lawyer at the time; rather, he asked about the future. (2) Even regarding the future, defendant's statement did not say that he necessarily would want to speak with a lawyer; he asked only if he would have an opportunity to speak with a lawyer later. *Although no single characteristic is controlling, defendant's statement, when considered in its entirety,* readily suggests that he was not invoking his right to speak to a lawyer at that time but might do so later."

*Id.* at 55 (emphases added). Thus, like in *Smith*, the court in *Charboneau* analyzed the defendant's words in the context in which they were uttered, this time expressly considering "the totality of circumstances."

Most recently, in *McAnulty*, we held that the defendant twice had invoked her right to remain silent when she "unambiguously communicated that she no longer desired to talk with detectives." 356 Or at 456. We also concluded, based on the context of her preceding interactions with the officers, that the defendant later invoked that right a third time by stating, "I don't want to no more, please, I don't want to." *Id.* at 452. The state had maintained that the defendant,

---

[5] The court did not engage in a separate analysis of each constitutional provision but, rather, applied the same reasoning to both Article I, section 12, and the Fifth Amendment.

[6] The right to counsel derives from two separate provisions in the Oregon Constitution—Article I, section 11, and Article I, section 12. The right to counsel recognized by Article I, section 12, is an adjunct to a defendant's state constitutional *Miranda* right. *See State v. Haynes*, 288 Or 59, 71, 602 P2d 272 (1979) (describing Article I, section 12, right to counsel as a "derivative right" to protect against involuntary confessions).

in her third invocation, merely had expressed a desire not to look at a photograph of the murder victim. We disagreed. We noted that, before the defendant's invocation, one of the officers had acknowledged that he was aware that the defendant did not want to look at anything and assured the defendant that he was "not going to ask [her] to do that." *Id*. He instead told the defendant that he still needed to ask her about the victim's injuries. When the defendant then stated, "I don't want to no more, please, I don't want to," we concluded—based on her words in light of the preceding circumstances—that she "effectively communicated her intent to stop the conversation." *Id*. at 456.

The foregoing decisions, although not expressly applying it, are consistent with the standard that, in determining whether an unequivocal invocation of the right against self-incrimination was made, a court considers the defendant's words, in light of the totality of the circumstances at and preceding the time they were uttered, to ascertain whether a reasonable officer would have understood that the defendant was invoking that right. That is the standard that the United States Supreme Court has adopted under the Fifth Amendment. *Davis*, 512 US at 458-59. Under that standard, "[e]vents preceding the [response]" or "nuances inherent in the [response] itself" can evince ambiguity and justify the conclusion that an accused's response was equivocal. *Smith v. Illinois*, 469 US 91, 100, 105 S Ct 490, 495, 83 L Ed 2d 488 (1984). However, "an accused's post request responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Id*.[7]

---

[7] Some courts applying the Fifth Amendment also have concluded that a suspect failed to unequivocally invoke the right against self-incrimination when what might otherwise be deemed to be an unequivocal invocation was immediately and spontaneously followed by words that were inconsistent with a desire to remain silent. Thus, for example, courts have concluded that no unequivocal invocation was made when words expressing a desire to end questioning were "separated by little more than a breath" from subsequent utterances that would lead a reasonable officer to doubt whether the defendant in fact wished to do so. *State v. Rogers*, 277 Neb 37, 67, 760 NW 2d 35 (2009); *see also, e.g., U.S. v. Stephenson*, 152 Fed Appx 904 (11th Cir 2005); *State v. Whipple*, 134 Idaho 498, 5 P3d 478 (2000); *Haviland v. State*, 677 NE2d 509 (Ind 1997). The state does not assert that that principle applies to the factual circumstances of this case and, therefore, we do not consider that issue.

That standard also comports with the demands of Article I, section 12. Whether or not custodial interrogation is actually abusive, this court has recognized that the setting in which it occurs is inherently coercive. *Sparklin*, 296 Or at 89. As then-Judge Gillette succinctly explained:

> "A person who is in custody is not the master of the situation; the police are. Article I, section 12, provides a way for a suspect to assert some control over the situation so that whatever he does will be the result of a knowing and voluntary choice."

*State v. Rowe*, 79 Or App 801, 805, 720 P2d 765, *rev den,* 302 Or 86 (1986). Where an officer reasonably would understand that a suspect in police custody has unequivocally invoked his or her right against self-incrimination, further questioning to confirm that the suspect actually meant to invoke that right—whether by design or not—can erode the suspect's will. To ensure respect for a suspect's choice, the rule prohibiting the further questioning of a suspect who has invoked the right against self-incrimination therefore should be applied from the perspective of the police officer who must follow it *at the time the officer is to follow it. See State v. Smith*, 301 Or 681, 713, 725 P2d 894 (1986) (Linde, J., dissenting). That standard has the further advantages of reducing "difficulties of proof and [providing] guidance to officers conducting interrogations." *Davis*, 512 US at 458-59. Thus, we conclude that, in determining whether a defendant's words constituted an unequivocal invocation of the right against self-incrimination under Article I, section 12, a reviewing court must consider those words, in the context of the totality of circumstances existing at the time of and preceding their utterance, to determine whether a reasonable officer would have understood that the defendant was invoking that right.[8]

---

[8] The concurrence is less certain that Article I, section 12, compels the conclusion that we reach, although it recognizes that a contrary conclusion would run afoul of the Fifth Amendment under the Supreme Court's decision in *Smith*. 356 Or at 621 (Kistler, J., concurring). For its part, the state does not appear to argue that Article I, section 12, permits the consideration of post-request circumstances. Rather, the state asserts that, under Article I, section 12, a "determination of a reasonable officer's understanding of a suspect's spoken words, under the totality of the circumstances, must include context." In support of that argument, the state relies in part on *Medina v. Singletary*, 59 F3d 1095, 1104 (11th Cir 1995), *cert den*, 517 US 1247 (1996), where, as the state notes, the court "recognize[ed]

The parties agree that, to determine whether that standard is met, a court may consider the preceding words spoken by the defendant and the interrogating officer, the demeanor, gestures, and speech patterns of the defendant, the demeanor and tone of the interrogating officer, and the point at which the defendant allegedly invoked the right to remain silent. Courts applying the Fifth Amendment have considered such contextual indicia,[9] and we agree that such indicia also are appropriate considerations in evaluating whether a defendant's words amounted to an unequivocal invocation of the right against self-incrimination under Article I, section 12.

With the foregoing principles in mind, we turn to the circumstances of this case.

## APPLICATION

The parties agree that, based on their ordinary meaning, defendant's words "I won't answer any questions," appeared unequivocally to invoke his right against self-incrimination. However, they disagree about what, in context, a reasonable officer would have understood those words to communicate. As noted, the trial court found as fact that defendant's words were "posed" as a "quandary" and that "defendant didn't quite understand what was going on at the time."[10] Based on that finding, the court reached the legal conclusion that defendant did not unequivocally invoke his right against self-incrimination. The ultimate question before us is whether evidence in the record preceding the apparent invocation supported that finding of fact and legal conclusion. *James*, 339 Or at 481.

The state makes three arguments in defense of the trial court's finding of fact and its resulting legal conclusion:

---

the importance of 'events *preceding* the [response]' or 'nuances inherent in the [response] itself.'" (Emphasis added).

[9] *See*, *e.g.*, *Rogers*, 277 Neb at 64-5; *People v. Arroya*, 988 P2d 1124 (Colo 1999); *People v. Glover*, 661 NE2d 155-56 (NY 1995).

[10] The word "quandary" can refer either to a "state of perplexity or doubt" or a "dilemma." *See Webster's Third New Int'l Dictionary* 1859 (unabridged ed 2002). It is not altogether clear from the trial court's ruling whether it meant to find that defendant was unsure about whether to invoke his right to remain silent or, as the court suggested in its next comment, that defendant was confused about his rights, or both. However, as explained below, any uncertainty as to the trial court's meaning does not ultimately affect our conclusion.

(1) the finding was supported by Ganete's testimony that he interpreted defendant's words as a question; (2) evidence of a language barrier between Ganete and defendant also supported the finding; and (3) the finding was supported by evidence that defendant either was confused about the warning that anything he said could be used against him or was uncertain whether to invoke his right to remain silent. We address those arguments in order.

First, the state asserts that the trial court's finding of fact was supported by Detective Ganete's testimony that he "interpreted [defendant's words] as a question that [defendant] was pondering from lack of understanding." The state posits that Ganete "genuinely perceived defendant's words as a question, presumably due to defendant's intonation and demeanor, which [Ganete] may well have mimicked for the trial court when repeating them in his testimony." There are two difficulties with that argument. First, there was no evidence in the record that defendant's demeanor, gestures, or tone of voice indicated to Ganete that defendant had posed a question.[11] Second—and in any event—the record shows that Ganete's interpretation of defendant's words was not based on defendant's demeanor, gestures, or intonation in uttering them, but, instead, was based on the *substance* of their conversation. When the trial court asked Ganete why, in light of defendant's "pretty unequivocal" words, Ganete "continue[d]," Ganete's reply was straightforward:

"Because I asked at one point 'are you saying you don't want to talk to me at all? You just want me to go away?' And his expression was, 'no I can't talk to you if I don't understand

---

[11] The state suggests that the transcriptionist who prepared the trial court record in this case erroneously punctuated defendant's words so that they appeared to be declarative, not interrogative. We reject that assertion. Neither party attempted to correct the record on appeal in accordance with the applicable procedure. As such, its contents bind us on review. The record on appeal includes "the record of oral proceedings," which "shall be a transcript." ORAP 3.05(1), (2). *See* ORAP 9.20(5) ("The record on review shall consist of the record before the Court of Appeals."). The circuit court determines the accuracy of the transcript, not the parties on appeal or this court. *See State v. Acremant*, 338 Or 302, 337, 108 P3d 1139 (2005) ("'It is elementary that it is the circuit court, not this court, which determines the correctness of the transcript which comes to this court on an appeal.'" (quoting *Fry v. Ashley*, 228 Or 61, 71, 363 P2d 555 (1961)). Although parties to an appeal may challenge the accuracy of a transcript and either correct or supplement the record, *see* ORS 19.365(4); ORS 19.370(6); ORAP 3.40, the state has not done so in this case.

what this right means because you're telling me I have the right to remain silent. I don't understand what this means.'

"So, your honor, I guess to clarify this, I—my understanding is that he wasn't understanding that right, and I made every effort to explain to him what that meant and this was our going back and forth until he finally said, 'Oh, I see what you're telling me. Okay. Under that condition, then I want to talk to you. I understand what that right means.'"

The problem is that, in chronological sequence, the verbal exchange on which Ganete relied took place *after* defendant said "I won't answer any questions," and *after* Ganete had moved on to a discussion of other rights, not before. Because Ganete's answer to the trial court's question was based on what transpired after defendant said "I won't answer any questions" and after Ganete nevertheless had continued the interview, the described exchange could not have informed Ganete's understanding of defendant's words when he uttered them.

Second, as noted, the state asserts that a "language barrier" between Ganete and defendant was an additional circumstance that supported the trial court's finding. It is true that the trial court referred to a language barrier in making its ruling. However, the only evidence in the record was that no such barrier existed. As discussed, Ganete testified that he and defendant were able to understand each other in Spanish, the language in which they conversed. Accordingly, that argument does not assist the state either.

Third, the state observes that, before defendant said "I won't answer any more questions," he appeared not to understand "the warning that anything he said could be used against him." The state argues that "[d]efendant had already expressed confusion regarding that warning and his question was the latest in a series of inquiries or statements seeking further clarification," and "[i]n that context, a reasonable officer could not have been certain whether defendant was continuing to seek clarification or whether he was switching gears and now invoking a right." We disagree.

The state is correct that the warning that "[a]nything you say may be used against you in a court of law,"

appeared to confuse defendant. And, it is true that that warning does refer to a consequence of a suspect's waiver of the right against self-incrimination. However, the warning and the right to remain silent were stated to defendant separately. Before he said "I won't answer any questions," defendant did not express any confusion about his right to remain silent. In fact, in light of the preceding conversation between defendant and Ganete, defendant's words indicated that he understood exactly what that right meant.[12] Thus, viewed in its proper context, defendant's apparent confusion about the meaning of the warning that his statements could be used against him could not reasonably be understood to cast doubt on the ordinary import of his declaration, "I won't answer any questions." *See Barrett*, 479 US at 529; *Kell*, 303 Or at 99 ("interpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous").

Moreover, to the extent that the trial court's finding that defendant "posed" a "quandary" was meant to indicate that defendant was uncertain about whether to invoke his right against self-incrimination, that finding was based on a similarly speculative—and equally impermissible—inference. That is, assuming that a reasonable officer would have understood that defendant was confused about the meaning of the warning that anything he said could be used against him, that confusion should not have been understood to indicate that, when defendant said "I won't answer any questions," he was uncertain about whether to invoke his right to remain silent. There was nothing in those words or the context in which they were spoken indicating that defendant was uncertain about whether to exercise that right, even though Ganete may have believed that, with further clarification of the warning, defendant might change his mind.

Of course, if defendant subsequently had reopened the dialogue with the officers by making unprompted statements that indicated a willingness to have a generalized discussion about the investigation, they could have

---

[12] As discussed, defendant previously had asked Ganete whether he "ha[d] to answer [his] questions," and Ganete had responded that defendant "did not have to answer any questions or talk to me if he chose to."

proceeded with further questioning. *McAnulty*, 356 Or at 456-57. Likewise, if the officers had reinitiated the conversation after waiting a reasonable length of time, given defendant new *Miranda* warnings, and defendant had indicated willingness to talk about the investigation, further questioning also would have been permissible. *Id*. at 458. In the meantime, however, the officers were required to take defendant at his word and cease questioning him. *Sparklin*, 296 Or at 89.

To recapitulate: Defendant's words "I won't answer any questions" appeared on their face unequivocally to invoke his right against self-incrimination. As discussed, the objective meaning of those words must be considered in the totality of circumstances at and preceding the time they were uttered, not based on evidence that occurred after defendant invoked his right to remain silent. Thus, the trial court erred in basing its conclusion on evidence that occurred after defendant invoked that right.

Here, there was no evidence in the record to support the state's argument that a reasonable officer would have understood defendant's words as a question when they were uttered. Nor was there evidence of a language barrier between defendant and the officer. Finally, there was no evidence that defendant's words posed a "quandary," in that they conveyed either confusion about the meaning of his right against self-incrimination or uncertainty about whether to invoke that right. Accordingly, there was no evidence preceding or contemporaneous with the invocation to support the trial court's conclusion that defendant failed to unequivocally invoke his right to remain silent. Because the officer continued to question defendant after his unequivocal invocation and that constitutionally precluded questioning led to defendant's challenged statements, those statements should have been suppressed for a violation of his right against self-incrimination.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**KISTLER, J.,** concurring in part and concurring in the judgment.

This case arises out of an officer's efforts to ensure that defendant understood his *Miranda* rights. Midway through a colloquy concerning those rights, defendant expressed uncertainty about what the admonition—that anything he said could be used against him—meant. The officer repeated the admonition, and defendant stated, "I won't answer any questions." The trial court recognized that defendant's statement, viewed in isolation, appeared to be an unambiguous invocation of his right to remain silent. The trial court found, however, that, viewed in context, defendant's invocation was ambiguous and that, in responding to it, the officer only sought to clarify defendant's *Miranda* rights. Considering the entirety of the officer's colloquy with defendant, the trial court found that defendant had not invoked his right to remain silent.

The majority reaches a different conclusion. In doing so, it does not question the conclusion the trial court reached; that is, the majority does not disagree that, if we considered the entirety of the officer's colloquy with defendant, the trial court correctly concluded that defendant had not invoked his right to remain silent. Rather, the majority holds that, in determining whether defendant invoked his right to remain silent, a court may consider only the evidence that preceded or was contemporaneous with that invocation. Looking solely at that evidence, the majority concludes that only one conclusion is permissible: Defendant's initial statement was an unambiguous invocation of his right to remain silent, and the statements that followed must be suppressed. The majority accordingly reverses the trial court's judgment and remands for further proceedings.

I concur in the majority's judgment, but my reasons for doing so differ in part from the ones that the majority gives. If the first issue that the majority decides were an open question, it might deserve more discussion than the majority gives it. As this case illustrates, the bright-line rule that the majority announces can result in suppressing a suspect's statements when the officer merely sought to ensure that the suspect understood his rights and did nothing to

impair the suspect's assertion of them.[1] However, the majority's rule has a legitimate prophylactic effect. It helps ensure that officers will not badger or cajole suspects who invoke their *Miranda* rights, and it avoids potentially difficult *post hoc* inquiries into whether the officer's clarifying questions went too far.

Were this an open issue, I might reach a different conclusion from the majority. After all, we frequently ask officers to make difficult, fact-specific judgment calls, and a rationale that the majority offers for the state constitutional rule that it announces—that officers need rules—rests on a premise that is inconsistent with that experience and begs the question of what the rule should be. Whatever the merit of that debate, however, the United States Supreme Court's decision in *Smith v. Illinois*, 469 US 91, 105 S Ct 490, 83 L Ed 2d 488 (1984), effectively forecloses it. In that case, the Court held that, under the Fifth Amendment, only evidence that precedes or is contemporaneous with a suspect's invocation of a *Miranda* right may be considered in determining whether the invocation was unambiguous. *Id.* at 100.[2]

---

[1] That was the situation in *Smith v. Illinois*, 469 US 91, 105 S Ct 490, 83 L Ed 2d 488 (1984), and it resulted in a divided Court for precisely that reason. In considering that issue, Justice Rehnquist's dissenting opinion reasoned:

"The Court asserts that subsequent statements cannot be used to call into question the clarity of an earlier 'request' for counsel. It may be that a crystal-clear statement could not be rendered ambiguous by subsequent responses to questions seeking clarification. But statements are rarely that clear; differences between certainty and hesitancy may well turn on the inflection with which words are spoken, especially where, as here, a seven-word statement is isolated from the statements surrounding it. But in the ordinary give-and-take of statement and response in a colloquy such as this, I see no reason why the entire flavor of the colloquy—lasting less than five minutes—cannot be considered by the trier of fact."

469 US at 101 (Rehnquist, J., dissenting).

[2] The officer in *Smith* advised the defendant of each *Miranda* right and then asked if he understood that right. 469 US at 92-93. Midway through that process and after being advised of his right to a lawyer, the defendant said, "Uh, yeah. I'd like to do that." *Id.* at 93. The officer continued by advising the defendant that, if he wanted a lawyer and could not pay for one, a lawyer would be provided free of cost, to which the defendant replied, "Okay." The officer then asked whether, knowing those rights, the defendant "wish[ed] to talk to [him] at this time without a lawyer being present." *Id.* The defendant responded, "Yeah and no, uh, I don't know what's what really." *Id.* The Court held that only the evidence that preceded the defendant's response, "Uh, yeah. I'd like to do that," could be considered in determining whether that response was an unambiguous invocation of

        To be sure, defendant does not raise a Fifth Amendment claim in this case. He invokes only his rights under Article I, section 12, of the Oregon Constitution, and we are free to adopt a less stringent standard under the state constitution than the Fifth Amendment rule that the Court announced in *Smith*. There would be little point, however, in announcing a state constitutional rule that permits Oregon courts to consider evidence that the Fifth Amendment precludes them from considering. For that reason, I agree with the majority that, in determining whether defendant's invocation was unambiguous, the trial court could consider only evidence that preceded or was contemporaneous with the invocation.

        The remaining question is whether the evidence that preceded defendant's invocation permitted the trial court to find his invocation ambiguous. In analyzing that issue, the majority correctly recognizes that the question whether defendant's invocation, viewed objectively, was ambiguous can turn on, among other things, his tone of voice, the inflection of his words, any gestures that preceded or accompanied the invocation, and the tenor of the conversation that preceded the invocation. The majority also correctly recognizes that those clues to the meaning of defendant's words are, in the first instance, questions of historical fact for the trial court. Having correctly recognized the fact-bound nature of the meaning of a person's statements, the majority also correctly recognizes that the record in this case is not sufficient to support the conclusion that the trial court reached.

        In this case, the state's argument that defendant's invocation was ambiguous rests on (1) the officer's opinion, which he stated at the suppression hearing, that defendant's invocation was more in the nature of "a question that he was pondering to me from lack of understanding" and (2) the uncertainty that defendant previously had expressed regarding *Miranda* rights generally and, more specifically, the meaning of the admonition that anything he said could be used against him.

---

the right to a lawyer. *Id.* at 100. Looking only at that evidence, the Court held the invocation unambiguous.

In my view, the difficulty for the state lies in the apparent clarity of defendant's statement, "I won't answer any questions." The statement, as the officer reported it, was unconditional. Moreover, the officer did not testify at the suppression hearing to any inflection in defendant's words or any quality in the tone of his voice that caused the officer to conclude that defendant was posing a question to him. Rather, the officer testified that he based his opinion that defendant was posing a question to him on defendant's "lack of understanding." And, under *Smith*, the only relevant evidence of defendant's lack of understanding consists of two questions that defendant had asked the officer before defendant said, "I won't answer any questions." As the majority explains, neither question undercuts the significance of the words that defendant used.

Defendant posed the first question immediately after the officer read defendant his *Miranda* rights and asked whether he understood them. Defendant responded, "I have a question. Do I have to answer your questions?" The officer told him that he "did not have to answer any questions or talk to [the officer] if he chose [not] to [do so]." And defendant explained that he understood. Defendant's first question provides no support for the officer's opinion. If anything, defendant's question and the officer's answer imply that defendant's subsequent invocation was unambiguous; that is, defendant chose to exercise the right to remain silent, which the officer had told him he had.

The second question occurred when the officer was going over each of the *Miranda* rights individually. The officer told defendant that "anything you say may be used against you in a court of law," and defendant stated, "I don't understand what this means." When asked what he did not understand, defendant replied, "Anything I say can be used against me." The officer responded, "That's correct. Anything you say can be used against you." At that point, defendant stated, "I won't answer any questions." Defendant's statement appears to be a *non sequitur*. It is not apparent, however, why defendant's uncertainty about the extent to which his statements could be used against him converts his apparent invocation of his right to remain silent into a question. If anything, defendant's uncertainty suggests that he

may have been concerned that his answers—whether exculpatory or inculpatory—could be used against him and, as a result, simply chose not to "answer any questions."

Frequently, what a person means will depend on a myriad of contextual clues, and a trial court's explicit and implicit factual findings regarding those clues will effectively resolve the question whether a particular invocation was ambiguous. In this case, however, the trial court based its conclusion that defendant's invocation was ambiguous on evidence that occurred after he invoked, and the evidence that preceded defendant's invocation is not sufficient to support a finding that defendant's words meant something other than what they said. In those circumstances, I agree with the majority's conclusion that defendant's invocation of the right to remain silent was unambiguous and foreclosed the state from using defendant's subsequent answers. Accordingly, I concur in part and concur in the judgment.

Linder, J., joins this opinion concurring in part and concurring in the judgment.