Argued and submitted November 3, 2015, reversed and remanded
March 9, 2016

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## BENJAMIN TYLER BROOKE,
*Defendant-Appellant.*

Lane County Circuit Court
221302254; A154882

369 P3d 1205

Andy Simrin argued the cause for appellant. With him
on the brief was Andy Simrin PC.

Jamie K. Contreras, Assistant Attorney General, argued
the cause for respondent. With her on the brief was Ellen F.
Rosenblum, Attorney General, and Anna M. Joyce, Solicitor
General.

Before Sercombe, Presiding Judge, and Tookey, Judge, and Shorr, Judge.*

SHORR, J.

_____

* Shorr, J., *vice* Nakamoto, J. pro tempore.

**SHORR, J.**

Defendant appeals a judgment convicting him of strangulation, ORS 163.187, and assault in the fourth degree, ORS 163.160, raising multiple assignments of error. In defendant's second assignment of error, he asserts that the trial court erred by admitting certain statements he made to police. Defendant argues that, prior to making those statements, he unequivocally invoked his right to counsel under Article I, section 12, of the Oregon Constitution, which required the police to immediately stop all questioning. We agree with defendant and reverse and remand.[1]

"What transpired during a custodial interrogation, including what a defendant said or did not say, is a question of fact," and we are "bound by the trial court's findings of fact if they are supported by evidence in the record." *State v. Avila-Nava*, 356 Or 600, 609, 341 P3d 714 (2014). We state the facts below in accordance with that standard.

Defendant and his girlfriend, M, were undergraduate students at the University of Oregon and lived in the same dormitory. The night of defendant's arrest, he and M got into an argument that resulted in a confrontation in a stairwell in their building. Following that confrontation, M went to the dormitory's front desk. The student working the desk later testified that M was crying, gasping for air, holding her neck, and told him, "My boyfriend just strangled me." The student called the University of Oregon Police Department, which dispatched three officers to the scene: LeRoy, Johnson, and Lebrecht. An officer with the Eugene Police Department, Dillon, was later dispatched to support the campus officers.

After the officers arrived, M spoke with LeRoy and then Dillon, separately telling both officers that defendant had grabbed her by the throat and squeezed until she could not breathe. M also told LeRoy that defendant "picked her up and threw her onto her right side where she landed * * * on

---

[1] In his first assignment of error, defendant challenges the trial court's denial of his motion to postpone trial. In his third assignment of error, defendant argues that the trial court erred in denying his requested jury instruction on self-defense. Our resolution of the second assignment of error makes it unnecessary to address those assignments.

her right wrist and her right hip." M told Dillon that defen-dant "shoved her to the cement floor, causing her to land on her right side." In addition, LeRoy later testified that, when he first approached M, he noticed red marks on her throat "that looked to [him] to be a handprint," as well as a bruise in the same area. Dillon also testified that M had "redness" and a bruise on her neck.

While LeRoy was interviewing M, Johnson and Lebrecht spoke with defendant. Johnson recorded that interview with a recorder he wore on the front of his belt. At the start of that recorded interview, defendant told Johnson that he had gotten into an argument with M and that they "both pushed each other." He told Johnson, "I didn't put my hands on her first, she pushed me and I kind of pushed her as well," and that he "knew that was not the right thing to do." The following exchange then occurred:

"JOHNSON:  Before we talk anymore, I want to advise you of something ok? * * * [Y]ou have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have one present with you while you're being questioned or if you're required to face a witness. If you cannot afford to hire a lawyer, one will be appointed to represent you. Do you understand those * * *?

"DEFENDANT:  Yeah, can I call my mom?

"LEBRECHT:  What?

"DEFENDANT:  Can I call my mom? She's a lawyer.

"JOHNSON:  Yeah, once we're done.

"LEBRECHT:  So do you not want to make a statement?

"DEFENDANT:  I'm fine. I mean, I know whatever I did was wrong."

Johnson proceeded to interview defendant about the incident and asked, "When you pushed her in the hallway here, * * * where did you make contact with her?" Defendant responded with a nonverbal gesture. Johnson then asked:

"What about the throat area? Did you touch her any-where in the throat?

"DEFENDANT:  Probably.

"JOHNSON: Was that—was that on purpose or is that kind of where your hand landed?

"DEFENDANT: Kind of where my hand always lands, and it always has [indiscernible]."

At that point, Johnson told defendant he was being detained. Defendant made a telephone call to his mother, the attorney,[2] while Johnson and Lebrecht briefly conversed. Johnson then ordered defendant to hang up the phone, which defendant did, and Johnson put defendant in handcuffs and placed him in the back of his patrol car. Sometime after that, Dillon got defendant out of the patrol car, reread defendant his *Miranda* rights, and proceeded to question him further about the incident in the stairwell. Defendant told Dillon that he had "grabbed [M] and pushed her against the wall," that "[b]oth [his] hands were near her neck," that his "right hand was close to her throat," and that M "hit the wall and then fell to the floor."

Defendant was charged with strangulation and assault in the fourth degree. Before trial, and at defendant's request, the trial court conducted what it referred to as a *Jackson/Denno* hearing,[3] in which defendant challenged— under both state and federal law—the voluntariness of the statements he made following his request to call his mother.

At the hearing, the state introduced the recording of Johnson's interview with defendant, and played it for the court. Johnson and Lebrecht also testified to their recollection of the interview, with Johnson testifying that he did not hear defendant say, "She's a lawyer."

"I didn't hear the part where he said his mother was an attorney. I just heard that he asked for him to call his mother.

---

[2] Though defendant asked to call his "mom," he was actually referring to his stepmother, who is an attorney. For the sake of clarity, we refer to her as his mother throughout this opinion.

[3] *Jackson v. Denno*, 378 US 368, 376-77, 84 S Ct 1774, 12 L Ed 2d 908 (1964) (holding that, where a criminal defendant challenges the voluntariness of statements made to officials that the state seeks to admit at trial, the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the trial court to hold "a fair hearing and a reliable determination on the issue of voluntariness").

"At that point, if it was just a call to his mother, I wouldn't have allowed it, being that he's, you know, a suspect for a crime at that point and I'm conducting a field interview. If he stated he was calling an attorney, I would have took that to invoke his right [to] an attorney, and I would have stopped my interview."

However, Lebrecht testified that he did hear defendant's complete statement: "I remember him saying, 'Can I call my mom? She's a lawyer.'"

Defendant argued to the trial court that he invoked his right to counsel at the outset of the interview with Johnson, which required the officers to cease all questioning. Thus, the officers' continued questioning violated federal and state law, which, in turn, required suppression of the resulting statements. The state countered that, "at best, [defendant's request was] equivocal, which [gave] the officers a right to ask clarifying questions, which they did." The trial court agreed with the state, and concluded that defendant's statements were "not an invocation of his right *** to consult with his attorney," and, "even if it was a proper invocation of his *** *Miranda* rights, he proceeded to waive—knowingly and freely waive his right, by indicating his willingness to continue without his mother or anyone else present."

At trial, the state called Lebrecht and Johnson, who testified to their interview with defendant, and the state introduced as evidence the recording of that interview and played the recording for the jury. The state also called Dillon and LeRoy; Dillon testified to the statements defendant made during Dillon's later interview with defendant, and both Dillon and LeRoy recounted their interviews with M, in which she told them that defendant had choked her. Additional witnesses called by the state also testified that M told them that defendant had choked her. When M testified, however, she recanted several statements she made to police and others. M testified that defendant did not grab or squeeze her throat, or choke her in the stairwell, or throw or push her to the ground. Rather, she said that defendant "grabbed my shirt collar and pushed me," and "then he let go and I fell" because "I tripped over my own foot." M explained

that she told the officers a different story because she was drunk and angry with defendant "to the point of vengeance." Defendant testified in his own defense and described the incident consistently with M's testimony, denying that he choked M or that he threw or pushed her to the ground. The jury found defendant guilty on both counts.

On appeal, defendant argues that the court erred in admitting the statements he made to officers after he asked to call his mother because, under the totality of the circumstances, his request—"Can I call my mom? She's a lawyer"—was an unequivocal invocation of his right to counsel. Defendant emphasizes that the request "came on the heels of Johnson's advice of [defendant's] right to counsel and was Defendant's response to Johnson's query about whether Defendant understood his rights." In that context, defendant argues, his request "can only be viewed as a request to exercise his constitutional rights to consult with counsel." Because that request was unequivocal, defendant argues, the interview should have stopped, the officers' follow-up questions were impermissible, and the statements defendant made after that invocation should have been suppressed.

The state responds that defendant's request was not an unequivocal invocation of his right to counsel. The state notes that defendant's request was "phrased in the form of a question," and, though the state acknowledges that defendant told the officers that his mother was an attorney, it emphasizes that "defendant did not tell the officers that his mother was representing him, or that he wanted to contact her for purposes of obtaining legal advice." Under those circumstances, the state contends, the officers were justified in asking follow-up questions, and that, in response to those questions, defendant voluntarily waived his right to counsel.

Thus, the issue is whether defendant's request to call his mother, whom he contemporaneously identified as an attorney, constituted an unequivocal invocation of his right to counsel under Article I, section 12. Whether a defendant's statements "amounted to an unequivocal invocation of the right against self-incrimination, an equivocal invocation, or no invocation at all, is a question of law," which we review for legal error. *Avila-Nava*, 356 Or at 609.

We begin our analysis with the rules governing the right against compelled self-incrimination. Article I, section 12, provides, in part, that "[n]o person shall be *** compelled in any criminal prosecution to testify against himself." That right against self-incrimination includes a "derivative right" to have an attorney present during custodial interrogation.[4] *State v. Scott*, 343 Or 195, 200, 166 P3d 528 (2007). Where a suspect unequivocally invokes the right to counsel, "questioning not only 'should' but must cease." *State v. Isom*, 306 Or 587, 593, 761 P2d 524 (1988). However, where a suspect's purported invocation is equivocal or ambiguous, police are permitted to ask follow-up questions "to clarify whether the suspect meant to invoke his right to counsel." *State v. Meade*, 327 Or 335, 339, 963 P2d 656 (1998).

In determining whether a defendant's invocation was unequivocal, "a reviewing court must consider those words, in the context of the totality of circumstances existing at the time of and preceding their utterance, to determine whether a reasonable officer would have understood that the defendant was invoking that right." *Avila-Nava*, 356 Or at 612-13. A statement that appears "tenuous or equivocal in isolation may be a sufficient request for counsel when evaluated in the context of all of the circumstances." *State v. Wickey*, 95 Or App 225, 230, 769 P2d 208 (1989). A court may not consider a defendant's post-request responses to additional police questioning to recast an otherwise unambiguous invocation as ambiguous. *Avila-Nava*, 356 Or at 612-13.

As the following cases demonstrate, a mere reference to an attorney does not necessarily constitute an unequivocal invocation of the right to counsel; however, where a suspect expresses a clear desire to speak with an attorney, that suspect has invoked that right. For example, in *State v. Charboneau*, 323 Or 38, 55, 913 P2d 308 (1996),

---

[4] On appeal, the state does not dispute that defendant was subject to a custodial interrogation when he made the statements at issue in this case. Additionally, the right to have counsel present during police questioning under Article I, section 12, is distinct from the right to counsel guaranteed by Article I, section 11, of the Oregon Constitution. That latter right to counsel is the right to be represented during criminal prosecution and does not attach until, "at the earliest, *** a defendant has been taken into formal custody." *State v. Davis*, 350 Or 440, 477, 256 P3d 1075 (2011) (emphasis omitted).

the Oregon Supreme Court held that the question, "Will I have an opportunity to call an attorney tonight?" was not an unequivocal request for counsel because the statement "asked about the future" and did not express "that [the defendant] necessarily would want to speak with a lawyer"; rather, the defendant asked "only if he would have an *opportunity* to speak with a lawyer later." (Emphasis in original.) The court concluded that, when considered in its entirety, the defendant's statement "readily suggest[ed] that he was *not* invoking his right to speak to a lawyer at that time but might do so later." *Id.* (emphasis in original).

In contrast, we held in *State v. Dahlen*, 209 Or App 110, 117-18, 146 P3d 359, *modified on recons*, 210 Or App 362, 149 P3d 1234 (2006), that the question, "When can I call an attorney?" was an unequivocal invocation of the right to counsel. We distinguished that question from the question in *Charboneau*—"Will I have an opportunity to call an attorney tonight?"—as follows:

> "First, the phrase 'will I have an opportunity to' may express a present desire to do something, or it may simply be intended to explore one's options. It is ambiguous. 'When can I,' in contrast, expresses a present desire to do the thing asked about. Second, the defendant in *Charboneau* 'did not say that he necessarily would want to speak with a lawyer; he asked only if he would have an *opportunity* to speak with a lawyer later.' In this case, defendant did not inquire about whether he would have 'an opportunity' to call an attorney later. Third, and most importantly, even if the first request could reasonably be understood to ask about the future and not to demand present action, defendant repeated the 'same' request less than an hour later. Unlike in *Charboneau*, where the defendant's request 'suggest[ed] that he was not invoking his right to speak to a lawyer at that time but might do so later,' the repeated request cannot reasonably be interpreted to mean that he 'might' wish to call his lawyer at some later time."

*Dahlen*, 209 Or App at 118-19 (emphasis and brackets in original; citations omitted).

Though in *Dahlen*, we emphasized the defendant's repetition of his request as "most important[]," we later held in *State v. Alarcon*, 259 Or App 462, 468, 314 P3d 364,

*rev den*, 354 Or 838 (2013), that a nearly indistinguishable request, made only once, amounted to an unequivocal invocation of the right to counsel. In *Alarcon*, an in-custody defendant asked an officer "when she could call a lawyer," and the officer told her she would get an attorney when she was arraigned. *Id.* at 464. That officer then told the assigned prosecutor that the defendant "was requesting to call an attorney." *Id.* The defendant was interviewed by detectives later that same day, and though they read the defendant her *Miranda* rights, the detectives did not mention the defendant's request for an attorney. *Id.* In holding that the request constituted an unequivocal invocation of the right to counsel, and that the detectives' subsequent interview was therefore unlawful, we observed that the defendant's request was "substantially similar to the query we evaluated in *Dahlen*," and that "the officer hearing defendant's query did not necessarily consider it to be ambiguous; jail staff communicated to the prosecutor that defendant 'was requesting to call an attorney.'" *Id.* at 468. "Under those circumstances," we concluded, "an officer would have reasonably understood that defendant was invoking her right to counsel." *Id.*

Defendant's statement in this case, taken in context, is substantially similar to the statements in *Alarcon* and *Dahlen*. As in *Dahlen*, when defendant asked, "Can I call my mom? She's a lawyer," he "expresse[d] a present desire to do the thing asked about"—that is, call his mother, the attorney. 209 Or App at 118. In fact, defendant's request here was more direct than the requests in *Alarcon* and *Dahlen*, because he did not preface his request with the word "when." *See Alarcon*, 259 Or App at 464 (the defendant asked "when she could call a lawyer"); *Dahlen*, 209 Or App at 115 ("When can I call an attorney?"). Defendant's words, taken alone, did not pose a question as to *when* he might be able to do the thing asked about; rather, they expressed a direct request to do that thing.

The state argues, however, that defendant's request was not unequivocal because defendant asked to call his "mom" rather than "a lawyer." The state acknowledges that defendant "followed that request with an assertion that his

mom is a lawyer," but it argues that, because defendant "did not tell the officers that his mother was representing him, or that he wanted to contact her for purposes of obtaining legal advice," the statement was equivocal and the officers were therefore justified in asking follow-up questions. The state cites as support for that argument our statement in *State v. Burghardt*, 234 Or App 61, 65, 227 P3d 783, *rev den*, 349 Or 370 (2010), that a defendant's right to consult with an attorney prior to taking a Breathalyzer test "is triggered by a request for legal advice, not merely a request to talk with an individual who happens to be a member of a bar association." As explained below, the rule of *Burghardt* does not apply here because the facts of that case are materially different from the facts here.

In *Burghardt*, we considered whether an arresting officer violated a defendant's right under Article I, section 11, of the Oregon Constitution[5] to confidentially consult with an attorney before taking a Breathalyzer test when that officer remained present during a telephone conversation that the defendant had with his father, who was an attorney. *Id.* at 63-65. The defendant, who had been arrested on suspicion of driving while under the influence of intoxicants, told the officer that "'he wanted to call his dad and ask his dad for a phone number,'" and that "'his dad was an attorney, but he couldn't be represented by him. He just wanted to call him and ask him for a phone number.'" *Id.* at 63. The officer asked whether the phone call was for the purpose of obtaining legal advice and the defendant again said that it was not, and "that he was just asking his father for a phone number for somebody else." *Id.* The defendant then called his father and proceeded to have a conversation while the officer stayed in the room. *Id.* The trial court concluded that the officer had violated the defendant's Article I, section 11, right to consult confidentially with counsel because the defendant's father was an attorney, and the fact that the

---

[5] While *Burghardt* addressed whether the defendant had invoked the right to counsel under a separate constitutional provision (Article I, section 11) than we consider here (Article I, section 12), the test for whether a person has invoked counsel under either provision is functionally the same. *See State v. Martinez*, 263 Or App 658, 664, 666, 328 P3d 1277, *rev den*, 356 Or 517 (2014) (describing test for invocation under both provisions as the same).

defendant was not calling his father for the purpose of legal advice was, according to the trial court, irrelevant. *Id.* at 64. We disagreed and reversed, concluding that the right to confidential communication with an attorney under Article I, section 11, attaches only when the purpose of the communication is to obtain legal advice. *Id.* at 65-66. Where the defendant had explicitly told the officer that the call was *not* for the purpose of legal advice, no such right attached. *Id.*

Central to our decision in *Burghardt* was that the defendant explicitly disclaimed any intent to seek advice from his father and told the officer that his father couldn't represent him. *Id.* at 63. The circumstances of the present case are distinct. Here, defendant made no such disclaimer; rather, the context of his statement indicated that he *did* want to call his mother for legal advice. When defendant asked to call his mother and, in the same breath, identified her as an attorney, he did so in direct response to the recitation of his right to consult with an attorney and Johnson's question as to whether defendant understood that right. Specifically, the last three sentences Johnson said were: "You have the right to talk to a lawyer and have one present with you while you're being questioned or if you're required to face a witness. If you cannot afford to hire a lawyer one will be appointed to represent you. Do you understand those ***?" Defendant answered, "Can I call my mom? She's a lawyer."

As noted above, a defendant's statement must be considered in context. *Avila-Nava,* 356 Or at 613. That context includes, among other things, statements made to the defendant by officers. *State v. Martinez,* 263 Or App 658, 667, 328 P3d 1277, *rev den,* 356 Or 517 (2014). A reasonable officer in Johnson's position would understand that defendant told the officers that his mother was an attorney because he asked to call her *in her capacity as an attorney.* There is no other reasonable explanation for why defendant, in those circumstances, would choose to disclose to the officers his mother's occupation and do so contemporaneously with his request to call her. Johnson testified that, if defendant had "stated he was calling an attorney, I would have took that to invoke his right [to] an attorney, and I would have stopped

my interview."[6] But defendant *did* state he was calling an attorney; that defendant identified her first as his "mom," and second as an attorney, does not change the import of his statement.

Accordingly, we conclude that, under the totality of the circumstances, defendant's statement in response to Johnson's *Miranda* warnings constituted an unequivocal invocation of his right to counsel. Because the officers did not immediately cease questioning, as they were required to do, all of the statements that defendant made after that point were inadmissible at trial.[7]

We turn to whether that error requires reversal of defendant's convictions. We will affirm a trial court's judgment, despite the erroneous introduction of evidence, if the error was harmless. *See* OEC 103(1) ("Evidential error is not presumed to be prejudicial."); *State v. Holcomb*, 213 Or App 168, 182-83, 182 n 8, 159 P3d 1271, *rev den*, 343 Or 224 (2007) (analyzing whether erroneous admission of the defendant's statements required reversal of the defendant's convictions, even in the absence of any party arguments regarding harmlessness). In determining whether an error was harmless, the question is "whether there was little likelihood that the particular error affected the jury's verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). The error was not harmless.

The state's evidence at trial included defendant's statements to Johnson, Lebrecht, and Dillon, and the

---

[6] The fact that Johnson did not hear defendant's complete statement does not affect our analysis. The trial court found that defendant told the officers that his mother was an attorney. Our review of the recorded interview, which was made part of the record on appeal, demonstrates that the statement was audible. To the extent that a reasonable officer might not understand that a defendant was invoking his right to counsel because the defendant's statement was inaudible, that is not the case here, nor does the state raise that argument on appeal.

[7] Though defendant was allowed a brief conversation with his mother shortly after Johnson concluded his interview, it is undisputed that the conversation with his mother was cut short when Johnson ordered defendant to hang up the phone so that he could be placed in handcuffs. The state does not argue on appeal that the brief conversation was a constitutionally sufficient opportunity to consult with counsel such that any later statements might be admissible. The state also does not argue that, because Dillon reread defendant his *Miranda* rights, Dillon's later questioning was proper, notwithstanding defendant's earlier invocation of his right to counsel. Accordingly, we do not reach those issues.

statements M made shortly after the incident to LeRoy, Dillon, and others. At trial, M recanted her most incriminating statements, and defendant testified consistently with M's testimony and denied choking her, or throwing or pushing her to the ground. The admission of the post-invocation statements defendant made to Johnson, Lebrecht, and Dillon tended to undercut the credibility of his and M's testimony and bolstered the state's case. Under the circumstances, we cannot say that there was "little likelihood that the particular error affected the verdict." *Davis*, 336 Or at 32; *see Holcomb*, 213 Or App at 185 ("We recognize that, in many instances, a criminal defendant's own statements regarding the crime are especially persuasive and potentially more likely to affect the jury's verdict than other sources of the same information."). Accordingly, we conclude that the error was not harmless.

Reversed and remanded.