Argued and submitted August 29, 2012, affirmed November 20, 2013, petition for review denied February 28, 2014 (354 Or 838)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ANGELA MARIA ALARCON,
*Defendant-Appellant.*

Umatilla County Circuit Court
CFH070358; A144927

314 P3d 364

Marc D. Brown, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Andrew M. Lavin, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Haselton, Chief Judge, and Sercombe, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Following a trial to the court, defendant was convicted of one count of first-degree assault, ORS 163.185, three counts of fourth-degree assault, ORS 163.160, and four counts of first-degree criminal mistreatment, ORS 163.205, relating to the abuse of two children. She appeals, raising three assignments of error. We reject without discussion defendant's second and third assignments of error, and write only to address her first assignment of error. In that assignment, defendant contends that the trial court erred in denying her motion to suppress evidence obtained during an interrogation conducted by police detectives on a Monday, following her request on Saturday to speak with an attorney. In particular, she asserts that that interrogation "violated [her] Article I, section 12, right to counsel." (Boldface omitted.) We agree with defendant that the court erred in admitting the evidence in question. However, we conclude that the error in this case was harmless. Accordingly, we affirm.

The facts relating to defendant's request for counsel are undisputed. Defendant was arrested on Friday, November 16, 2007, in connection with an allegation that she had abused S, a young child who lived in defendant's home. After her arrest, defendant was held in jail, and the prosecutor instructed jail personnel not to permit defendant to contact anyone. On the same day that defendant was arrested, Oregon State Police detectives Banks and Ford questioned her at the jail regarding abuse of J, another young child who lived with defendant. During the questioning, Banks reminded defendant of her *Miranda* rights (of which she had been advised at the time of her arrest). He also informed her that she could stop the interview any time she wanted and asked her if she was comfortable talking with him. During the questioning, which lasted several hours, defendant made a number of incriminating statements. Among other things, defendant acknowledged that she had, on a number of occasions, hit J's head on something hard, such as the wall or the floor. She stated that after she did this, he had become very tired and, on one occasion, he had vomited. In response to a question as to how defendant had hurt J's head, defendant stated that she was "positive it was from the shower" and that she had "shoved him against the wall" of the shower.

Defendant also stated that she had not taken J to the hospital because she "knew [she] was going to have to say that [she] did it," that there were three times when she had hit J's head that were more significant than others, and that she had hit his head on the faucet in the bathtub.

After that interview ended, defendant was held in jail over the weekend and was not permitted to communicate with anyone. On Saturday, November 17, defendant asked an officer at the jail "when she could call a lawyer." She was told by the officer that she would get an attorney when she was arraigned. Then, on the morning of Monday, November 19, while Banks was meeting with the prosecutor, jail staff informed the prosecutor by phone that defendant "was requesting to call an attorney." The prosecutor instructed jail staff to permit defendant to use a telephone only to call an attorney. Banks, at that point, understood that defendant wanted to speak to an attorney. In the meantime, the officer at the jail went back to defendant and asked her whether she had an attorney whom she wanted to call. When defendant responded that she did not, the officer informed her that she would get an attorney when she was arraigned.

Later that morning, Banks and Ford again questioned defendant. At the beginning of the questioning, Banks again informed defendant of her *Miranda* rights and told her that the district attorney's office had asked him to speak with her again. He did not, at that point, mention defendant's question to jail staff about an attorney. During the Monday interview, defendant made additional incriminating statements. In particular, Banks showed defendant a picture of J's head, stated that it was "healing from an injury here," and asked her what had caused it. She responded that it was "[p]robably from me slamming him in the tub." She further stated that in September 2007 she had "slammed his head against the edge of the tub" and that, after that incident, J had been very tired and vomited and then slept all day. At the end of the interview, defendant asked Banks when she could talk to a lawyer, and a brief discussion ensued concerning her earlier request of jail staff. Following that discussion, which lasted several minutes, Banks ended the interrogation.

Defendant was charged with four counts of first-degree assault as to J, four counts of criminal mistreatment as to J, one count of third-degree assault as to J, one count of criminal mistreatment as to S, and one count of third-degree assault as to S. Before trial, defendant moved to suppress all evidence relating to the Monday, November 19 interrogation, asserting that she had been interrogated after she had requested an attorney and without having been given an opportunity to speak to an attorney. After a hearing on the motion, the court issued a written order. In its order, the court found that, on Saturday between the first and second interviews, defendant had asked jail staff when she could call a lawyer, and "the jail staff essentially asked 'if she had a particular lawyer she wanted to call' and defendant did not. Essentially, the jail staff then told her that she would get a lawyer at arraignment." The trial court concluded that defendant's "query to the jail staff was equivocal and she was not stopped from calling a lawyer, it was just that she did not have a lawyer to call." Under the totality of the circumstances, the court concluded that defendant's statements from the second interview were not subject to suppression and denied her motion.

Defendant waived a jury trial and was tried to the court. During the trial, all of defendant's statements made to Banks during both the Friday and Monday interrogations were admitted into evidence. Ultimately, defendant was convicted of first-degree assault on Count 1, fourth-degree assault on Count 3, first-degree criminal mistreatment on Counts 5 through 8, and fourth-degree assault on Counts 9 and 10. Counts 2 and 11 (one count of first-degree assault and one count of first-degree criminal mistreatment) were dismissed, and defendant was acquitted on Count 4 (assault in the first degree).

On appeal, as noted, defendant argues that the trial court erred in denying her motion to suppress the statements that she made during police questioning on Monday, November 19. She asserts that she unequivocally invoked her right to counsel prior to that questioning. She also asserts, in the alternative, that, if her request for counsel was equivocal, police improperly failed to follow up by asking her questions to clarify her intentions. The state

responds that defendant made only an equivocal invocation of her right to have an attorney present during questioning and that police properly took the necessary steps to clarify defendant's intent. "The admissibility of a defendant's statements during custodial interrogation is an issue of law," and we review the trial court's determination on that issue "for legal error." *State v. Holcomb*, 213 Or App 168, 173, 159 P3d 1271, *rev den*, 343 Or 224 (2007). We conclude that, even if defendant's invocation was equivocal as the state asserts, police failed to adequately clarify her intent. Accordingly, we conclude that the trial court erred in admitting defendant's statements obtained during the Monday interrogation.

A defendant has a right to the assistance of counsel during a custodial interrogation. *State v. Meade*, 327 Or 335, 339, 963 P2d 656 (1998). "[A] level of coercion is inherent in any custodial setting and * * * a lawyer's presence at a custodial interrogation is one way to ensure the right to be free from compelled self-incrimination." *Id.* Thus, "when a suspect in police custody makes an unequivocal request to talk to a lawyer, all police questioning must cease." *Id.*; *see also State v. Montez*, 309 Or 564, 572, 789 P2d 1352 (1990) ("When a suspect in custody unequivocally requests to talk to a lawyer, *that request must be granted* and further questioning must cease." (Emphasis added.)). However, when the request is equivocal, "the police may follow up with questions intended to clarify whether the suspect meant to invoke his right to counsel." *Meade*, 327 Or at 339; *see also State v. Gable*, 127 Or App 320, 329, 873 P2d 351, *rev den*, 319 Or 274 (1994) ("If a suspect's request for counsel is equivocal, subsequent interrogation must be limited to clarifying the suspect's intent.").

"Whether a request is an equivocal or unequivocal request for counsel depends on whether a reasonable officer would have understood that the suspect was invoking the right to counsel." *State v. Dahlen*, 209 Or App 110, 117, 146 P3d 359, *modified on recons*, 210 Or App 362, 149 P3d 1234 (2006). "We determine whether a defendant has made an unequivocal request for counsel by analyzing the request in light of the totality of the circumstances to determine whether a reasonable officer in the circumstances would have understood that the suspect was invoking his right to

counsel." *State v. Field*, 231 Or App 115, 123, 218 P3d 551 (2009) (internal quotation marks omitted).

In *Dahlen*, we analyzed whether a defendant had made an unequivocal request for counsel in circumstances similar to those presented in this case. 209 Or App at 115. There, the defendant was arrested for robbery and placed in a cell. About eight hours later, from the cell, he asked an officer when he would be able to call his attorney. The officer with whom the defendant spoke noted in the "prisoner log" that the defendant wanted to call an attorney. *Id.* at 112. The defendant later asked about an attorney a second time. After that inquiry, the detective investigating the robbery interviewed the defendant. He informed the defendant of his *Miranda* rights both orally and in writing, and the defendant acknowledged both orally and in writing that he understood those rights. The detective then questioned the defendant and obtained a confession to the robbery.

On appeal, we considered whether the defendant's confession should have been suppressed on the basis that he had made an unequivocal request for counsel when he asked when he could call an attorney. We concluded that the question—"When can I call an attorney?"—constituted an unequivocal request for counsel. *Id.* at 117. We explained:

> "[T]he central issue here is how defendant's use of the adverb 'when' related to the rest of the sentence 'can I call my attorney.' The ordinary meaning of 'when' is 'at what time: *** how soon' *Webster's Third New Int'l Dictionary* 2602 (unabridged ed 2002). Were we to accept the state's interpretation of defendant's request (that is, that '[a]t most, [defendant] was asked *when* he would have an opportunity to call an attorney') we would be required either to read words into the request that defendant did not utter (namely, 'will I have an opportunity to') or to conclude that defendant used the word 'when' out of step with its ordinary meaning. A reasonable officer would interpret defendant's words consistently with their ordinary meanings and would not understand the defendant to say something he did not actually say."

*Id.* at 118 (brackets and omission in original). We further observed that "the phrase 'will I have an opportunity to' may express a present desire to do something, or it may

simply be intended to explore one's options. It is ambiguous. 'When can I,' in contrast, expresses a present desire to do the things asked about." *Id.*; *cf. State v. Charboneau*, 323 Or 38, 55, 913 P2d 308 (1996) (the query "Will I have an opportunity to call an attorney tonight?" is equivocal). We further noted that the officer hearing the defendant's query did, in fact, understand that the defendant wanted to call an attorney and that that understanding was reflected in the notation in the prisoner log. Under the totality of the circumstances presented, we concluded that the defendant's question amounted to an unequivocal request for counsel.

Here, defendant's query about "when she could call a lawyer" is substantially similar to the query we evaluated in *Dahlen*. Furthermore, like the officer in *Dahlen*, the officer hearing defendant's query did not necessarily consider it to be ambiguous; jail staff communicated to the prosecutor that defendant "was requesting to call an attorney." Banks, at the suppression hearing, responded to the question whether, before starting the second interview of defendant, he "pretty much had notice that she wanted to speak to an attorney" by saying, "Yes, I knew that she had contacted the staff about an attorney. Absolutely." Under those circumstances, an officer would have reasonably understood that defendant was invoking her right to counsel, and no further questioning of defendant should have occurred.

In any event, even if we were to conclude that defendant's question constituted only an equivocal invocation of the right to counsel, officers in this case failed to follow up with questions intended to clarify whether defendant meant to invoke her right to counsel. *See Meade*, 327 Or at 339. The state argues that, at the beginning of the Monday interrogation, Banks again advised defendant of her *Miranda* rights and that she "indicated her willingness to continue answering the detectives' questions during the second interview." Under the circumstances, we do not agree with the state that officers sufficiently clarified defendant's intent.

After her arrest, defendant was held in the jail and was not permitted to communicate with anyone. During the first police interview on the day of her arrest, defendant was informed of her rights. The next day, defendant asked an officer when she could call a lawyer. The answer that she

ultimately received was that, if she did not have a particular attorney whom she wanted to call, she would have to wait until her arraignment to get one. Despite this question and answer, Banks initiated a second interview with defendant and, at the beginning of that interview, did not mention her query regarding an attorney—which he had been told was a request to call an attorney—but instead only advised defendant again of her *Miranda* rights. Given that, by then, defendant had been informed by an officer that she would get a lawyer when she was arraigned (or, in other words, that if she did not have an attorney to call, she would not get one until arraignment), merely informing her of the same rights that she had been informed of before her query regarding an attorney was not sufficient to clarify her intent. Under all the circumstances, the evidence obtained from the Monday interrogation should have been suppressed.

We turn next to the issue of whether the error in admitting the evidence from the second interview requires reversal of defendant's convictions relating to J's head injuries.[1] We will affirm a judgment of conviction notwithstanding the erroneous admission of evidence if there is little likelihood that the admission of the evidence affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003).

> "In determining whether the error affected the verdict, it is necessary that we review the record. However, in so doing, we do not determine, as a factfinder, whether the defendant is guilty. That inquiry would invite this court to engage improperly in weighing the evidence and, essentially, retrying the case, while disregarding the error committed at trial, to determine whether the defendant is guilty."

*Id.* Instead, in determining whether there is little likelihood that the admission of the evidence affected the verdict, we consider "the nature of the erroneously admitted evidence

---

[1] Defendant and the state agree that, in any event, the admission of the evidence from the second interview was not harmful with respect to defendant's convictions on Counts 3 and 7 to 10, which did not relate to J's head injuries. Only Counts 1, 5, and 6 related to those injuries: Count 1 charged that defendant intentionally caused serious physical injury—"head injury"—to J, and the state "elected 'skull fracture' and 'brain injury' as its theories for Counts 5 and 6," which charged defendant with knowingly withholding necessary physical care and medical attention from J.

in the context of other evidence on the same issue." *State v. Maiden*, 222 Or App 9, 13, 191 P3d 803 (2008), *rev den*, 345 Or 618 (2009). As part of that consideration, we assess "any differences between the quality of the erroneously admitted evidence and other evidence admitted on the same issue." *Id.*; *see also Davis*, 336 Or at 33-34 (evaluating whether the finder of fact would have considered evidence duplicative, cumulative, or unhelpful). We also consider whether the evidence in question relates to a central factual issue in the case, as opposed to a tangential issue. *Maiden*, 222 Or App at 13; *State v. Roller*, 201 Or App 166, 173, 118 P3d 804 (2005).

Here, complete transcripts and audio recordings of both of defendant's interviews with police were admitted at trial. The state contends that, even if "the trial court erroneously denied defendant's motion to suppress, that error was harmless." (Boldface omitted.) In particular, the state points out that.

> "[i]n both interviews, defendant confessed to slamming [J]'s head up against hard objects. Each of defendant's confessions was in response to the detectives asking her about [J]'s specific head injuries. During each interview, defendant provided a timeframe for the assaults and described [J]'s physical reactions to them. Therefore, defendant's statement during the second interview was no more incriminating than her statements during the first interview."

Defendant "acknowledges that many of the statements made by her in the Monday interrogation were also made in the Friday interrogation." However, she asserts that one statement from the second interview "was particularly harmful and had no counterpart" from the earlier questioning. In particular, she asserts that admission of her statement from the Monday interrogation that she "probably" caused the injury to J's head when she slammed his head on the edge of a bathtub in September was harmful because, although she had previously acknowledged hitting J's head against a wall, "her statements on Monday were substantially more harmful" because she was shown a picture and "specifically confessed."

We agree with the state that, given the nature and extent of defendant's confessions during the first interview, there is little likelihood that the admission of defendant's

statements from the second interview affected the verdict. Although the evidence in question related to central factual issues in the case—the abuse of J—it was not significantly different than the evidence on the same issue obtained from the Friday interview.

By the end of the Friday interview (and, therefore, before her query regarding an attorney on Saturday), as relevant to this assignment of error, defendant had confessed to slamming both the back and sides of J's head onto hard surfaces, including floors, walls, the shower, and a faucet, on numerous occasions. She had admitted that several times when this happened, she had noticed a significant difference in J's demeanor—that he became very tired—and that she had been concerned, but had not sought medical attention for J because she had not wanted her actions discovered. She also had observed that, on one occasion, when she had slammed J's head, he had vomited. Finally, she had confessed that she was "positive" that the injury to J's head occurred from her hitting it on the shower.

Again, the only evidence from the Monday interview that defendant asserts is harmful and different from what had been obtained in the first interview was her "confession" to causing injury to J's head on the edge of the tub. Banks showed defendant a picture of J's head and asked her whether she knew what had caused J's injury.

"[Defendant]: Probably from me slamming him in the tub.

"Q   Do you know—I mean, do you remember if he had an injury that was here in this area?

"A   I didn't notice it.

"Q   When you slammed—any time—any of the times that you slammed him, did ever this part of his head strike something?

"A   Yeah, like the edge of the tub.

"Q   The edge of the tub. And how long ago was that?

"A   September.

"Q   September of this year?

"A   Yeah.

"Q '07. And that was slammed his head against the edge of the tub?

"A Yeah.

"Q What happened to him after that?

"A He was tired. He was really tired. And I got him up and I got him dressed and I told him to go and go and find something to do, that he couldn't be in his room, and then he was standing by the dining room and he threw up, like everywhere, everywhere. He just like threw up. And he said he was really, really tired. He slept, like, all day."

She also stated that she did not seek medical attention for J because "he had bruises on his [buttocks]."

Although defendant asserts that that evidence was particularly damaging because it was more specific than her statements from the first interview and because it was a "specific confession" to one of the charges, we disagree. First, we observe that defendant made very similar statements during the first interview regarding J's head injury. One of the detectives asked defendant, during the Friday interview, what had happened to J's head, and defendant stated that she was "positive it was from the shower." She further described hitting J's head on hard surfaces:

"Q How many times do you think that you pushed his head into something hard?

"A About four or five times.

"Q Did you notice any significant difference in his demeanor after that?

"A He was just really tired, like really tired.

"Q Did he get sick, vomit?

"A He would just be, like, out. He vomited one time. One time he puked everywhere. And then I said, Are you okay? And he said, I'm just tired. He said, I'm tired, Mom. And I said, Okay. And I got scared and I didn't want to take him to the hospital because I knew, like I knew that I was going to have to say that I did it. * * *

"* * * * *

"Q How many times did that happen like that?

"A  At least four times.

"Q  At least four times that he got—Were any of them to the back of the head?

"A  Yeah.

"Q  How many of those?

"A  Two.

"Q  Were any to the front of the head?

"A  No.

"Q  Any to the side?

"A  Side.

"Q  Was it the left side or the right side?

"A  Both."

Later during the first interview, Banks asked defendant again about injuries to J's head:

"Q  Okay, when you hit his head, you said there was about four times where you hit his head?

"A  Maybe more.

"Q  Maybe more. Was there some that were more significant than others, that worried you more? How many that really worried you?

"A  Probably three of them.

"Q  Probably three of them?

"A  Really, really worried me.

"Q  And what did you hit his head with?

"A  Just the wall or the floor. I wouldn't hit him with objects. I would just grab him and just slam him, or I would grab him, and if he was, like, acting like he was going to fall, I would do that.

"Q  Was there ever like a corner of the tub, was there ever like a faucet?

"A  There was a faucet.

"Q  Was that where?

"A  In the tub."

In view of the nature and extent of defendant's confession during the Friday interview, it is extremely unlikely that any additional detail that Banks elicited during the Monday interview made any difference to the verdict in this case. Comparing defendant's statements from the Monday interview with those from the earlier questioning, they appear, for the most part, to be the same. Indeed, as the state points out, defendant's statements from the first interview may be even more damaging than the exchange she points to from the later questioning. In both interviews, defendant admitted to slamming J's head, that he became very tired after she did so, and that on one occasion he vomited "everywhere." In the first interview defendant stated that she was "positive" that the injury came from the shower and that she had hit J's head against a faucet in the tub. In the second interview she said that the injury was "probably" from when she slammed J in the tub and stated that, once, in September, his head had hit the edge of the tub. Those admissions regarding the injuries to J's head are similar, and any differences between them are insignificant.

We further note that, during the trial, defendant attempted to raise questions regarding how J's head was injured and, although the state referenced defendant's statements during both interviews, it emphasized her statement during the first interview that she was "positive" that J's injury came from her slamming his head in the shower. While cross-examining defendant during the trial, the prosecutor brought up that statement on more than one occasion, and defendant agreed that she had made that statement to the detectives.

To summarize, we conclude that the differences between the erroneously admitted evidence from the second interview and the other, properly admitted evidence from the first interview are insignificant. Given the nature and scope of defendant's admissions during the Friday interrogation, there is little likelihood that the admission of the evidence of defendant's statements from the Monday interrogation affected the verdict in this case.

Affirmed.