Argued and submitted September 30, 2013, affirmed March 18, petition for review denied September 10, 2015 (357 Or 743)

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**JOANA MARIA ROWAN UNDERHILL,**
*Defendant-Appellant.*

Lincoln County Circuit Court
093236, 100339;
A149159 (Control), A149441

346 P3d 1214

Ingrid A. MacFarlane, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Anna M. Joyce, Solicitor General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Douglas F. Zier, Senior Assistant Attorney General.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Schuman, Senior Judge.*

HASELTON, C. J.

_____
* Haselton, C. J., *vice* Wollheim, S. J.

## HASELTON, C. J.

Defendant was convicted, following a bench trial, of two counts of sexual abuse in the first degree, ORS 163.427.[1] On appeal, she raises two assignments of error. We reject without published discussion defendant's second assignment of error, pertaining to a motion for judgment of acquittal for one of the charges, and write to address her first assignment of error. In that assignment, defendant contends that the trial court erred in denying her motion to suppress statements that she made in the course of, and following, a polygraph exam. Specifically, she argues that, under the totality of the circumstances, her statements were not given voluntarily and that her statements in a subsequent police interview were derivative of that illegality. In addition, defendant contends that the statements that she made in the context of the polygraph exam were inadmissible under the analysis of *State v. Harberts*, 315 Or 408, 848 P2d 1187 (1993), and that, in all events, those statements cannot be presented fairly without reference to the polygraph context.

For the reasons explained below, we conclude that the trial court did not err in determining that defendant voluntarily participated in the polygraph exam. We further conclude that, even assuming, without deciding, that defendant's statements in the polygraph context were inadmissible under the evidentiary limitations prescribed in *Harberts*, any error was harmless, given the proper admission and consideration of other, more detailed and inculpatory, statements that defendant made outside of the polygraph context. Accordingly, we affirm.

We review the trial court's denial of defendant's motion to suppress for errors of law. *State v. Ehly,* 317 Or 66, 75, 854 P2d 421 (1993). We are bound by the trial court's findings of fact when there is constitutionally sufficient evidence in the record to support those findings. *Id.* When the court has made no findings, we presume that the court found the facts in a manner consistent with its ultimate conclusion. *Id.* The following relevant facts are either undisputed

---

[1] Defendant was charged with a single count of sexual abuse in the first degree in Marion County and in Lincoln County. The cases were consolidated for a single trial in Lincoln County.

or are consistent with the trial court's findings of fact and ultimate conclusion.

Defendant and her ex-husband (father) are the parents of a daughter, L. On July 14, 2009, Lincoln County Police Detective Miller received a complaint from father's girlfriend that defendant might be sexually abusing L, who was then three years old. Miller contacted the Department of Human Services (DHS) to inquire about those allegations. On July 20, 2009, DHS returned Miller's call and informed her that *defendant* had recently alleged that *father* had sexually abused L but that, after an investigation, DHS had determined defendant's allegations to be unfounded. DHS told Miller that, given the recentness of that investigation, it was going to deem the girlfriend's report of child abuse to be unfounded.

Miller spoke with defendant by telephone about the allegations the next day, and defendant explained that she and father were having issues in relation to their divorce and were "battling over custody" of L. Defendant also told Miller that she was concerned about the conditions at father's house because L had just returned home from his house with a diaper rash, flea bites, and cat scratches. Defendant denied ever touching L with a sexual purpose and explained that she only touched her daughter for routine caretaking. During their phone conversation, Miller never told defendant that she was obligated to answer Miller's questions; nor did Miller make any promises or threats during the conversation. A few days later, on July 23, defendant went to Miller's office and reported that L had just returned from weekend visitation with father and had suspicious bumps on her head.

During either the phone interview or the subsequent office visit, Miller asked defendant if she would be willing to take a polygraph exam. Such a request is routine in cases where, as here, the victim was too young to be interviewed. Miller told defendant that the exam was "totally voluntary" and that the polygraph could not "be used against [her] in a court." She also told defendant that she could "get up and walk out, if she [did not] want to take it." Defendant agreed to submit to the polygraph exam. Defendant ultimately agreed to take the exam on August 2.

Later on the same day that she had agreed to take the polygraph exam, defendant spoke with a DHS employee, Davis. Davis's contemporaneous reports recount that defendant told Davis that she had spoken with Miller and that she was "willing to do a polygraph regarding this matter." Davis told defendant that she had created a safety plan for L and that, under that plan, defendant could not have any unsupervised contact with L until the police investigation was completed. Specifically, Davis noted in her report that she had discussed "with [defendant] a safety plan, until a polygraph has been completed." Another DHS employee, Kelly, confirmed that she had requested that defendant "not have unsupervised contact with her daughter until that polygraph had been done." However, she denied telling defendant that she would not regain custody unless or until she passed a polygraph.

On August 2, at about 11:00 a.m., defendant met with police polygrapher, Sergeant Turre, at the Lincoln County Sheriff's Office to take the polygraph exam. Before he administered the exam, Turre informed defendant of her rights—a combination of *Miranda* warnings and advice that taking the polygraph was voluntary—and defendant acknowledged those rights by signing the advice of rights card.[2] Turre

---

[2] The advice of rights card read as follows:

"IT IS MY DUTY AS A POLICE OFFICER, AND POLYGRAPH EXAMINER, TO INFORM YOU OF YOUR LEGAL RIGHTS:

"• YOU HAVE THE RIGHT TO REMAIN SILENT;

"• ANYTHING YOU SAY CAN BE USED AGAINST YOU IN A COURT OF LAW;

"• YOU HAVE THE RIGHT TO TALK TO AN ATTORNEY AND HAVE HIM PRESENT DURING QUESTIONING;

"• IF YOU CANNOT AFFORD TO HIRE AN ATTORNEY, ONE WILL BE APPOINTED TO REPRESENT YOU AT NO EXPENSE;

"• YOU ALSO HAVE THE RIGHT TO TAKE OR REFUSE THE POLYGRAPH EXAMINATION;

"• IF YOU DECIDE TO TAKE THE EXAMINATION, YOU CAN STOP THE EXAMINATION AT ANY TIME YOU WISH.

"I HAVE READ, AND UNDESRTAND, EACH OF THE RIGHTS LISTED ABOVE, AND HEREBY WAIVE MY RIGHTS AND AGREE TO TAKE A POLYGRAPH EXAMINATION. I UNDERSTAND THAT ANY INFORMATION DISCUSSED DURING THE EXAMINATION OR INTERVIEWS MAY BE SHARED WITH THE APPROPRIATE INVESTIGATOR."

(Capitalization in original.)

also informed defendant that she could stop the exam at any time. He told her that the polygraph was 97.3 percent accurate and that the entire process was being recorded. Turre made no threats or promises and did not tell defendant that she would be unable to see her daughter if she refused to take the polygraph.

During the same "pre-test" discussion, Turre also asked defendant about her medical status. Defendant informed him that she had a stent from a kidney stone removal procedure. Turre explained that one of the straps for the polygraph would go around her abdomen and that she should tell him if it became uncomfortable. Turre asked defendant if she had taken any medications before she came in, and defendant said that she had last taken oxycodone and hydrocodone at 10:00 p.m. Defendant also informed Turre that she had been sexually abused as a child by various members of her family.

During the polygraph exam, defendant's demeanor was calm and reserved; defendant never asked to stop the exam. According to Turre, defendant did not appear to be under the influence of any intoxicant and showed no indication of being in pain. Defendant did not ask to take any pain medication or to have anything to drink during the exam.

After the polygraph exam was completed, Turre informed defendant that she "didn't do very well." Defendant did not seem shocked or express disbelief in failing the exam; instead, in Turre's words, she "just got quiet." Turre explained that the polygraph showed that defendant was being "deceptive" and that he had "no doubt that [defendant] touched [L's] vagina" beyond normal caretaking. Turre asked defendant why she had done that, and defendant responded that she did not do that. Turre told defendant that the polygraph showed that she had "failed worse on the question where you touched her vagina for your own sexual arousal"; again, defendant denied having done that. Turre told her, "Your body is telling me that you did" and that he needed "to try to understand why."

For a third time, defendant denied sexual contact with L stating, "I didn't do it." Turre responded, "Well, I think you did," and suggested that maybe, because of her

history of sexual abuse, defendant had "been curious and may have touched [L] out of curiosity, but *** more than normal caretaking."

Defendant then told Turre that she had talked to her counselor about her parenting because she was afraid of being an abusive parent, because of the abuse that she had suffered. However, defendant denied sexual contact with L for a fourth time, stating, "I've never touched her like that." Turre responded, "You have. You have. I need you to be honest with me here, okay?" He explained that he did not "look down" on defendant, but believed that, because of her "past," defendant had touched L for her own sexual arousal.

Turre then asked defendant, "How many times have you done that?"—and defendant replied "I haven't done it more than twice." Around that time, defendant's demeanor changed, and she began to cry. Turre asked defendant what she had done specifically, and she replied that one time she "pushed on [L's] vagina more than [she] should have." When Turre asked defendant if she had rubbed L's vagina for a noncaretaking reason, she nodded in agreement. She then stated that it happened once when she was still married and L was about one year old, and once in about December 2008.

At that point, Turre ended the examination and called Miller. He told Miller that defendant had failed the polygraph exam and had admitted to touching her daughter twice—once in Lincoln County and once in Marion County.[3] Miller asked Turre to arrest defendant and said that she would meet them at the station to discuss the examination. Turre then told defendant she was under arrest and allowed her to phone her mother. During that call, Turre overheard defendant admit to her mother that she had inappropriately touched L.

At about 1:30 p.m., Miller met Turre and defendant in a small room near the main booking area. Miller readvised defendant of her *Miranda* rights, and defendant signed the acknowledgment of rights and agreed to speak

---

[3] Defendant confessed to touching L once when she was about one year old and defendant was still married to father. At that time, defendant was living in Marion County. Defendant also confessed to having touched L a second time, in December 2008, when she was living in Lincoln County.

to Miller. During the interview, defendant was "quiet, upset, [and] not real emotional." Defendant told Miller that, in November or December 2007, when L was one year old and living in Marion County, she had rubbed antibiotic cream on L's vagina "longer than she should" have because she was "curious." Defendant admitted that she touched L's vagina in a sexual manner and that she knew she had "crossed the line." Defendant told Miller that on another occasion, in November or December 2008 in Lincoln County when L was two years old, she had "touched and pinched" L's bare bottom "in an attempt to test herself for feelings of sexual arousal" and to see "if [she] was still a monster." Defendant explained that she had been sexually abused as a child and that the abuse would begin when her grandfather pinched her on her bottom. During her conversation with Miller, defendant did not complain of any pain, did not ask for any medication, did not ask to stop the interview, and did not ask for an attorney. She did not appear disoriented or distraught and she was responsive to Miller's questions.

Defendant was subsequently charged with two counts of first-degree sexual abuse, with one count alleging the conduct in Marion County, and the other, conduct in Lincoln County. Defendant moved to suppress (1) her statements to Turre in the context of the polygraph exam and (2) her statements to Miller in the subsequent interview. In her Supplemental Memorandum of Law, and related arguments, defendant advanced two overarching contentions. First, defendant asserted that, considering the "totality of the circumstances," including her recent surgery, her history of sexual abuse, and that she "was told that she could not be alone with her daughter unless she made statements," her participation in the polygraph exam was not voluntary. Consequently, she asserted, her statements in the context of the exam were unlawfully elicited and must be suppressed—and her admissions to Miller during the subsequent police interview must also be suppressed as derivative of those prior statements.[4] Second, defendant argued that her statements

---

[4] Significantly for our purposes, 269 Or App at 660, at no time before the trial court did defendant ever contend that her statements to Turre in their discussion relating to the polygraph exam results were involuntarily elicited as the product of some promise that those statements could not, and would not, be used against defendant.

in the polygraph context did not "express [her] belief or recollection as to an independently relevant fact or * * * support an inference as to such a belief or recollection," *Harberts*, 315 Or at 416, because they expressed only a belief in the truthfulness of Turre's representation of what the polygraph exam showed. In a related sense, defendant, again invoking *Harberts*, contended that those statements must be excluded because their substance could not be fairly conveyed without reference to the polygraph setting in which they were made.

At the suppression hearing, defendant presented evidence that on July 22, 2009, she had a "lithotripsy," a surgical procedure by which kidney stones are crushed so that they may pass through the urinary tract. Defendant's doctor, Michnowska, explained that, after the procedure, she prescribed defendant narcotic pain medication because she had complained of "a lot of" pain. In addition, on July 27, 2009, Michnowska wrote defendant a letter to excuse her from work for the next three days. Michnowska explained that, after a lithotripsy, it is important that the patient stay well-hydrated to help flush the stones and that dehydration causes more pain.

Kazmarak, defendant's treating social worker, testified that she had diagnosed defendant with post-traumatic stress disorder (PTSD) stemming from her significant history of childhood sexual abuse. She also testified that a person suffering from PTSD could have difficulty concentrating, difficulty self-advocating, and an increased vulnerability to suggestion. Dr. Nielsen, a forensic psychologist, performed a psychological examination of defendant on September 10, 2009, and also diagnosed defendant with PTSD. He explained that, in certain settings, defendant's disorder could trigger flashbacks to her abuse and make her more susceptible to suggestion.

Defendant testified that an employee at DHS had told her that she "couldn't have visitation with [her] daughter, unless [she] took the polygraph" and that she had to "be with [her] family at all times" when she was with L. Defendant stated that she did not take her pain medication before the polygraph because she was worried that she

was not "going to be thinking straight" and, consequently, during the polygraph she was uncomfortable and in pain. She also testified that, during Turre's post-test interview, she felt attacked, trapped, confused, and powerless. She explained that she sometimes experiences flashbacks of her childhood abuse and that, during the post-test, she was having flashbacks.

Ultimately, the trial court issued a written order, including 132 findings of fact, denying defendant's motion to suppress. The court noted that "[t]he recollections of the various witnesses vary significantly" and that, "[w]here they diverge, the Court accepts [as] more accurate those of Miller, Turre, Davis and Kelly." The court concluded that defendant's participation in the polygraph procedure was voluntary:

> "There was no unlawful police conduct. The Court has great compassion for the inhumane abuse to which the defendant was subjected as a child. However, her emotional vulnerability does not render suspect or unlawful what either Miller or Turre did involving the defendant. Both Miller and Turre were thorough in explaining her *Miranda* rights and the fact that she was not required to go through a polygraph test. Neither Davis nor Kelly told the defendant that she could not have unsupervised contact with her daughter unless she passed the polygraph test. * * * There was no police conduct which rendered the defendant's taking of the polygraph involuntary."

The court also rejected defendant's *Harberts*-based challenges:

> "The defendant's statements to Turre during the polygraph expressed her belief or recollection as to an independently relevant fact or supports an inference as to such a belief or recollection. The court further determines that defendant's statements to Turre during the polygraph may be redacted to exclude any reference to the polygraph test without significantly altering the meaning of the original statements in the context in which they were made. * * *

> "The State has demonstrated conclusively that the defendant's statements to Miller and Turre were freely and voluntarily made."

After the trial court denied defendant's motion to suppress, defendant waived the right to a jury and was tried to the court. At trial, the state presented evidence from several people, including father, his girlfriend, father's sister, and defendant's mother, pertaining to L's concerning behavior. Among those behaviors, father testified that L tried to insert a toy spoon into her vagina during a bath and, when he asked her why she was using the spoon that way, L said, "Because Mommy did it." Father testified that, another time, in July 2009, L asked father if she could play the "touching game." Father asked L how that game was played and L demonstrated by touching the vaginal area of her doll. L told father that she played that game with defendant and hated it. Defendant's mother testified that, among other things, she had observed L touching her genitals in the bathtub and rubbing her dolls together.

The state also presented evidence from Miller and Turre. Without mentioning the polygraph exam, Turre testified that defendant had confessed that she had touched L for sexual purposes twice. After defendant had confessed to him, defendant had called her mother and Turre overheard defendant tell her mother that she had touched L "inappropriately." Miller testified that, immediately after reading defendant her *Miranda* rights, defendant admitted that, when L was two years old, "she touched [L] in a sexual manner." Defendant also said she "touched and pinched [L] on the bare buttocks * * * to 'see if I had those [sexual] feelings; if I was still that monster.'"

In addition, defendant's cell-mate, Scott, testified. She explained that she had shared a cell with defendant for about 24 hours after defendant had first been arrested. Scott testified that defendant had told her that "she had touched [L], * * * while she was changing [L's] diaper, because she wanted to know what a baby felt like." Scott testified that defendant said that she had touched L "pretty much every time that she would change [L's] diaper, she said she would pinch [L's] butt, because her grandfather had done it to her." Defendant also told Scott that she had rubbed her daughter's genitals more than she should have and that she had done it "[p]retty much every time she would change [L's] diaper."

In response, defendant presented evidence that L had told several people, including L's daycare provider and defendant's mother, that "daddy" had touched her vagina. Defendant provided evidence that a doctor at the Lincoln County Children's Advocacy Center had asked L if anyone had hurt her genital area, and L had shaken her head no. A clinical social worker testified that, when L saw defendant, she was "very excited" and did not want the visit to end while simultaneously saying that she had a "mean mommy" and a "mean papa." Defendant herself testified that she had pinched L's bottom "countless times" and one time had a flashback to her abuse as a child. She testified that, when she was interviewed by Turre, she was in pain and "loopy" from pain medication. She asserted that she had never touched L for sexual purposes.

Ultimately, defendant was convicted of two counts of sexual abuse in the first degree, ORS 163.427.

On appeal, defendant advances—with one qualitative difference noted below—the same challenges that she raised in her motion to suppress. First, defendant argues that the trial court erred in concluding that her participation in the polygraph exam process, including her statements to Turre, was not involuntary—and, accordingly, she asserts that both those statements and her admissions to Miller in the subsequent interview were erroneously admitted. Second, and alternatively, defendant argues that her statements to Turre, after he had administered the polygraph exam, were inadmissible as a matter of (nonconstitutional) evidentiary law under the limiting principles set out in *Harberts*.

For the reasons that follow, we affirm the trial court's conclusion as to the voluntariness of defendant's participation in the polygraph exam and consequent statements. Given that conclusion, defendant's unambiguously inculpatory admissions to Miller in the subsequent police interview were not derivative of any unlawful police conduct and were, thus, properly admitted. Because defendant's admissions to Miller were even more explicitly inculpatory than her statements to Turre, the former rendered any purported *Harberts*-based error as to the latter, at most, harmless error.

### VOLUNTARINESS OF DEFENDANT'S
### PARTICIPATION IN THE POLYGRAPH EXAM
### AND CONSEQUENT STATEMENTS

To determine whether a statement or a confession is voluntary, we examine if, "under the totality of the circumstances, it was the product of an essentially free and unconstrained choice, the defendant's will was not overborne[,] and his capacity for self-determination was not critically impaired." *State v. Aguilar*, 133 Or App 304, 307, 891 P2d 668 (1995).

Here, defendant argues that her "acquiescence in Turre's bullying must be viewed not only in the light of * * * DHS's interest in the polygraph outcome, but also with the facts that defendant had had a painful surgical procedure 11 days before the polygraph and suffered from post-traumatic stress disorder based on her own history of sexual abuse."

The trial court made extensive findings that defendant's medical history and history of past abuse did not render her agreement to take the polygraph involuntary. Upon review, the record supports those findings. Specifically, the record substantiates the trial court's findings: that defendant was "sufficiently pain-free * * * [and] healthy enough to undergo a polygraph test"; that there was "no evidence in the case that * * * defendant was taking any medicine which would have * * * compromised [the polygraph]"; that it was no "'more than a possibility' that * * * defendant experienced a flashback to her childhood during the polygraph procedure" and that "conjectur[e] * * * did not refute the prosecution's testimony that * * * defendant was mentally and physically competent to be questioned * * *."

The record also substantiates the trial court's determination that neither DHS nor the police had engaged in conduct rendering defendant's participation in the polygraph exam involuntary. In particular, as recounted above, defendant had voluntarily agreed to take the polygraph *before* DHS ever informed her that there could be no unsupervised visits with L until the police investigation was completed. Defendant's prior agreement by itself supports a reasonable inference that her decision was autonomous. Conversely, there is no evidence that, but for the intervening

conversation with DHS, she would otherwise have changed her mind and rescinded her agreement to participate in the polygraph process. To be sure, defendant may well have assumed, at the time that she agreed to participate, that, if she passed the polygraph, that might have belayed concerns about whether she had abused L and, concomitantly, facilitated visitation. But those circumstances did not render her decision involuntary.

On appeal, defendant also advances for the first time a cogent argument that her statements should have been suppressed because she was assured by Miller that the polygraph exam could not be used in court—and a reasonable person might well understand that the "post-test" discussion with Turre was part of the polygraph exam.

Although the state has not urged nonpreservation, we have a prudential obligation to determine *sua sponte* whether a contention has been preserved for appellate review. *State v. Wyatt*, 331 Or 335, 345-47, 15 P3d 22 (2000). The purpose of preservation is to give "a trial court the chance to consider and rule on a contention, thereby possibly avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal." *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008). "[W]hen determining if an issue has been adequately preserved for review, the appropriate focus 'is whether a party has given opponents and the trial court enough information to be able to understand the contention and to fairly respond to it.'" *State v. Blasingame*, 267 Or App 686, 691, 341 P3d 182 (2014) (citing *State v. Walker*, 350 Or 540, 552, 258 P3d 1228 (2011)).

Here, review of defendant's original argument on appeal cannot be reconciled with those dictates of jurisprudential comity and procedural fairness. That is so because defendant's present contention as to the purported scope and effect of Miller's assurances is qualitatively different from any matter urged before the trial court—and, if raised, might well have materially altered the manner in which the record developed. Accordingly, we are constrained from considering that contention on appeal.

As noted above, in her Supplemental Memorandum of Law, defendant asserted that, considering the "totality of the circumstances," including her recent surgery, her history of sexual abuse, and that she "was told that she could not be alone with her daughter unless she made statements," her statements were not voluntary. Specifically, at the suppression hearing, defendant argued that

"a variety of factors * * * created a perfect storm for an involuntary coerced statement. This is post-surgery * * *. [Defendant] has testified to the pain, but she's not the only one that's testified to her pain. Her husband testified. * * * Her doctor, * * * Michnowska, testified * * * about the problems of pain associated with kidney stone surgery and the aftermath. So it's not made up. It's a serious operation, and it has serious pain * * *.

"You've heard from two professionals that [defendant is] diagnosed with Post Traumatic Stress Disorder, and it's not surprising considering the history of abuse that she suffered as a small child to the point that she was removed from the home and in counseling for her whole life to deal with issues around child sex abuse.

"The issues of her medication, both the anti-anxiety medications, and the pain medications, those medications are given for a reason, and when she's not taking them, it's going to have an effect when she testified that she was affected by the pain, by the stress, the post-traumatic stress, and the history of abuse, and so it's the State's burden under [*State v. Mendacino*, 288 Or 231, 603 P2d 1376 (1979)], to show that this is a voluntary statement."

Defendant never argued to the trial court—as she does on appeal—that the voluntariness of her statements to investigators was affected by Miller's comments in their initial conversation in which she agreed to take the polygraph. Much less did she argue either that she would never have agreed to participate but for Miller's comments or that, as a result of any promise by Miller, her statements to Turre—and subsequently to Miller—were effectively "immunized." Consequently, the trial court did not have an opportunity to consider whether there had been a promise of "immunity" as to any statements—and, if there had been a promise, whether that promise included references to, variously,

(a) the polygraph procedure, (b) the results of the polygraph exam itself, and/or (c) any discussions with the polygrapher that occurred immediately before or after the exam.[5] If defendant's present contention had been timely raised, testimony from Miller and Turre—and, potentially, even defendant—bearing on those matters and their appropriate resolution might have been developed. But that did not occur, depriving the trial court of a fair opportunity to make an informed ruling and avoid purported error. *Peeples*, 345 Or at 219. Accordingly, the matter is not preserved.

In summary, the trial court did not err in finding that, under the totality of the circumstances, defendant voluntarily participated in the polygraph exam process and that her statements in the context of that process, including her inculpatory admissions to Turre, were not the product of unlawful police conduct. Further, because defendant's only challenge to the admission of her subsequent inculpatory statements to Miller was that they were the unattenuated product of the allegedly involuntary polygraph procedure, those statements were properly admitted at trial.

### ADMISSIBILITY UNDER *HARBERTS* OF DEFENDANT'S STATEMENTS TO TURRE

We return to defendant's second contention that, regardless of voluntariness, her inculpatory statements to Turre were inadmissible under *Harberts*, 315 Or at 415-16, because they "expressed only a belief in the truthfulness of Turre's representation or interpretation of what the polygraph test showed," or, alternatively, those statements cannot be presented fairly without reference to the polygraph context.

In *Harberts*, the Supreme Court addressed the admissibility of certain statements that the defendant, who

---

[5] In his concurrence in *State v. Jarnagin*, 351 Or 703, 728, 277 P3d 535 (2012), Chief Justice De Muniz noted that consent forms given prior to a polygraph exam "often serve only to increase the ambiguity of the *Miranda* rights." In that regard, the concurrence questions whether a consent form that states, "I also understand that Polygraph Examinations are not generally admissible in a court of law" refers "to the fact of the examination, the results of the examination, or something else altogether? Should examinees infer that anything they say immediately before, after, or during their tests will be inadmissible—or not?" *Id.* (De Muniz, C. J., concurring).

was charged with aggravated felony murder, had made in the context of a polygraph exam. After first rejecting the defendant's contention that his statements must be suppressed as involuntary, *id.* at 412, the court proceeded to address the admissibility of the statements under the Oregon Evidence Code, specifically OEC 401, OEC 402, and OEC 403. In that regard, the Supreme Court held that, when determining the admissibility of statements made in the context of a polygraph examination, the court must first determine "whether a defendant's statement expresses the defendant's belief or recollection as to an independently relevant fact * * * or supports an inference as to such a belief or recollection." 315 Or at 415. If the court determines that the statement "does not express the defendant's belief or recollection as to an independently relevant fact and does not support an inference as to such a belief or recollection, it is not admissible and cannot be redacted to make it admissible." *Id.* at 415-16 (footnote omitted).

Further, if a statement is properly found to "express a defendant's belief or recollection as to an independently relevant fact or to support an inference as to such a belief or recollection," the trial court must then determine "whether the statement can be redacted to exclude any reference to the polygraph examination without significantly altering the meaning of the original statement in the context in which it was made." *Id.* 416-17. "The fact that information from or about a polygraph examination causes a defendant to say something that he or she otherwise would not have said does not necessarily prevent the meaning of the statement from being conveyed without reference to the information from or about the polygraph examination." *Id.* at 417.

Here, as noted, defendant asserts that her inculpatory statements to Turre run afoul of the first of *Harberts*'s limitations and, in all events, are not susceptible to appropriate "redaction." We need not resolve those questions because, assuming, without deciding, that none of defendant's inculpatory statements to Turre was admissible under *Harberts*, any error in that regard was harmless.

We will affirm a judgment of conviction notwithstanding the erroneous admission of evidence if there is

little likelihood that the admission of the evidence affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). "In determining whether the error affected the verdict, it is necessary that we review the record. However, in so doing, we do not determine, as a factfinder, whether the defendant is guilty." *Id*. "Instead, in determining whether there is little likelihood that the admission of the evidence affected the verdict, we consider the nature of the erroneously admitted evidence in the context of other evidence on the same issue." *State v. Alarcon*, 259 Or App 462, 469-70, 314 P3d 364 (2013), *rev den*, 354 Or 838 (2014) (internal quotation marks omitted). "As part of that consideration, we assess any differences between the quality of the erroneously admitted evidence and other evidence admitted on the same issue." *Id*. at 470 (internal quotation marks omitted).

Here, as discussed above, we have concluded that defendant's participation in the polygraph exam and her confession were voluntary. Accordingly, again as noted, defendant's inculpatory admissions to Miller were not derivative of any illegality and, consequently, were admissible at trial. At trial, Miller testified that defendant told her that

"when [L] was a year old * * * she put diaper cream on her fingers, and rubbed the cream on [L's] vagina. She said that she was curious, and that she rubbed the cream on [L's] vagina longer than—she said, 'longer than I should.' She said that she had touched [L's] vagina in a sexual manner, saying, 'I knew I had crossed the line. What I did was disgusting.'"

Defendant admitted to Miller that, when L was two years old, "she touched [L] in a sexual manner. She said she touched and pinched [L] on the bare buttocks to attempt to test herself for feelings of sexual arousal. She also said it was a test to 'see if I had those feelings; if I was still that monster.'"[6]

Defendant's inculpatory admissions to Miller— admissions that she made immediately after she had been readvised of her *Miranda* rights—were far more detailed and unambiguously inculpatory than those she made to Turre.

---

[6] As noted above, defendant's cell-mate, Scott, also testified that defendant had told her that she had molested her daughter.

The statements to Turre were, at most, essentially duplicative of her admissions to Miller. Consequently, there was no qualitative difference in the evidence. *See Alarcon*, 259 Or App at 470 ("As part of that consideration, we assess any differences between the quality of the erroneously admitted evidence and other evidence admitted on the same issue." (Internal quotation marks omitted.)). Accordingly, there is little likelihood that the admission of the evidence affected the verdict. *Davis*, 336 Or at 32.[7]

Affirmed.

---

[7] At trial, the only challenges to her inculpatory statements were that she was in pain and "loopy" from pain mediation and that she was experiencing a flashback to her abuse as a child. As noted above, the trial court explicitly rejected those challenges when it denied defendant's motion to suppress.